## No. 13,281.

State ex rel. State Pharmaceutical Association et al. vs. John T. Michel, Secretary of State.

### Syllabus.

1. A bill which has passed both Houses of the General Assembly and been signed by the presiding officers thereof is *presented* to the Governor within the meaning of the Constitution when the Clerk of the House of Representatives or Secretary of the Senate carries the same to the Executive office and offers or tenders it to the Governor, or his Secretary.

2. The mandate of the Constitution is not that the Governor must act, in the way of a veto, within five days of his *reception* of a bill, but within five days of its *presentation* to him.

3. The day on which the bill is presented is not to be included in the computation of the five days, but the last day of the specified period is to be computed.

State ex rel. State Pharmaceutical Association et al. vs. Secretary of State.

4. A "day" in this sense begins at 12 o'clock midnight and extends through twenty-four hours to the next 12 o'clock midnight.

5. There is a general rule that where a limitation of time is fixed within which a particular act or thing is required to be done, if done at all, after which performance, or the doing of the thing, would be without effect, if the time limited exceed a week, an intervening Sunday is *included* in the computation; if less than a week, Sunday is *excluded*.

6. When the time stipulated is such that it does not *necessarily* include Sunday, Sunday is excluded from the computation without express mention of the fact; when the time stipulated must *necessarily* include Sunday, to exclude that day from the computation there must be an express declaration to that effect.

7. It follows that if one of the five days accorded the Chief Executive in which to return a bill with his objections happens to be Sunday, the same is not to be computed as one of the constitutional "five days".

8. This view is strengthened by the general policy of the law in regard to the first day of the week, which by statute in Louisiana is made a day of "public rest", and by the sentiment prevailing in Christian countries.

9. Whatever doubt may exist in the judicial mind as to the proper meaning to be given to the words used, it is safely resolved in favor of that construction sanctioned alike by the policy of the law and the moral sentiment of the people.

APPEAL from the Fifteenth Judicial District Court, Parish of East Bation Rouge.—*Brunot, J.*

*Albert Voorhies* for Plaintiff, Appellant.

*Milton J. Cunningham,* Attorney General, (*Charles M. Cunningham,* of Counsel), for Defendant, Appellee.

The opinion of the court was delivered by

BLANCHARD, J. This is a proceeding by *mandamus* to compel the Secretary of State to promulgate as a law, duly enacted, an act of the General Assembly of the State of Louisiana, known as "House Bill No. 46" entitled "An Act to Amend and Re-Enact Act No. 66 of the Acts of 1888, entitled "An Act to Regulate the Practice of Pharmacy; to regulate the sale of compounded medicines and drugs, preparations and prescriptions; to regulate the sale of poisons; to create a State Board of Pharmacy, and to regulate the emoluments thereof; to prevent the practice of pharmacy by unauthorized persons, and to provide for the trial and punishment of violators of this act by penalties and through civil process, and to repeal all laws contrary to, or in conflict with any of the provisions of this act."

The contention of the relators is that at a late session of the General Assembly the aforesaid bill duly passed both Houses and was on the 8th of July, 1898, signed by the Speaker of the House of Representatives and by the Lieutenant Governor and President of the Senate; that the enrolled copy of the bill so signed was presented to the Governor of the State on the same day, July 8, 1898, for executive approval; and that the act not having been returned by the Governor within five days thereafter, the General Assembly continuing in session, it had become a law as though the executive signature in approval thereof had been attached.

The further contention is that application was made to the Secretary of State to promulgate the act in accordance with law, and that he refuses to do so.

To the preliminary writ, requiring him to show cause why the act should not be promulgated, the Secretary of State, through the Attorney General, answers, in effect, that he should not be required to promulgate the act as a law of the State for the reason that the same was vetoed by the Governor within five days after he received the same at the hands of the Messenger of the House, and was not, subsequently, passed by the action of the two houses of the General Assembly, the Governor's veto to the contrary notwithstanding.

The case was tried below on the following admission of facts:

"It is admitted that House Bill No. 46, after being signed by the Speaker of the House and Lieutenant Governor on the 8th of July, 1898, was carried to the Governor's office about ten or eleven o'clock on the night of July 8th. That the Governor's private secretary had gone home and that the Governor declined to receive the bill at that hour. That this bill was in a batch containing a large number as shown by the receipts; that on the next day, July 9th, the bills were delivered to the Governor, and he signed a receipt which had been prepared on July 8th without noticing the date. That the engrossed copy of the bill, along with the copies of the other bills included in the same receipt, was delivered to the Secretary of State at four P. M. on July 9th, as shown by memorandum made by the Secretary of State at that time. That the Secretary of State also signed a receipt for this bill, together with the other bills, dated July 8th, without noticing the date.

"It is further admitted that the Governor's veto reached the House of Representatives at eleven-twenty P. M. on July 14th, just before

State ex rel. State Pharmaceutical Association et al. vs. Secretary of State.

adjournment, and that the House did finally adjourn that night at twelve o'clock without acting on the veto. That the Governor takes no note of the hour that a bill is received or the hour when a veto is sent in. But the Secretary of State noted the hour that he received the engrossed copy of House Bill No. 46, and the Clerk of the House noted the hour at which the veto came in."

There was judgment refusing to make the writ peremptory and dismissing the action at relators' cost.

This appeal followed.

The question first arising for determination is what constitutes *a presentation* of an act of the General Assembly to the Chief Executive for his action, under the Constitution.

If the act known as "House Bill No. 46" were, in the constitutional sense, presented to him on July 8th, and he did not return the same with his veto to the House in which it originated until more than five days after such presentation, then the act must (unless an intervening Sunday—one of the five days—is excepted from the computation) be considered as having become a law, and the veto without effect to prevent that consummation.

Article 41 of the Constitution is imperative that: "As soon as bills are signed by the Speaker of the House and President of the Senate, they shall be taken at once, and on the same day, to the Governor by the Clerk of the House of Representatives, or Secretary of the Senate."

The bill in question was signed by the Speaker of the House and President of the Senate on July 8th, 1898. It, therefore, became the duty of the Clerk of the House to take it *at once, on the same day,* to the Governor and he did so. It was between ten and eleven o'clock at night, it is true, but the Governor was in his office at the Capitol building and it was "the same day" on which the presiding officers of the two Houses had attached their signatures to the bill.

If the Clerk of the House had not taken the bill that day, at once after its signature by the presiding officers of the two Houses—certainly before twelve o'clock midnight—to the Governor, he would have failed in the duty prescribed for him by the organic law.

Article 76 of the Constitution declares that: "Every bill which shall have passed both Houses shall be presented to the Governor. If he approve it, he shall sign it; if not, he shall return it, with his objections in writing, to the House in which it originated, etc."

The language is "every bill   *   *   *   shall be *presented* to the Governor."

Here, the bill was carried to the Governor's office; it was at night; the Governor's private secretary had gone to his home, but the Governor himself was there; the Clerk of the House made known the object of his visit; the Governor declined to receive the bill; the clerk withdrew and returned with the bill the next day, July 9th, 1898, when it was received by the Governor and a receipt signed dated July 8th, 1898. It seems this receipt had been prepared by the clerk the evening previous, expecting the bill to be then received by the Governor, and the next day when it was signed the date was not noticed.

Undoubtedly the object of the Clerk of the House in going to the Executive office on the night of July 8th was to fulfill his constitutional duty of presenting the bill to the Governor on the same day on which the presiding officers of the two Houses had signed it. When he made known the purpose of his visit to the Governor and tendered the bill, it was *a presentation* of it in the constitutional sense, and the fact that the Governor declined to then receive it did not render nugatory and ineffective this presentation.

To hold otherwise would put it in the power of the Chief Executive to delay at will *the presentation* of a bill to him, something the Constitution is careful to guard against.

"If any bill," says the last clause of Article 76 of the Constitution, "shall not be returned by the Governor within five days after it shall have been *presented* to him, it shall be a law in like manner as if he had signed it, unless the General Assembly, by adjournment, shall prevent its return, in which case it shall not be a law."

The mandate of the organic law is not that the Governor must act, in the way of a veto, within five days of his *reception* of a bill, but within five days of its *presentation* to him.

If it were the first, he might by not *receiving* a measure hold it up until within five days of the end of a session of the General Assembly, then receive it, and the adjournment taking place would prevent its return, thus defeating its becoming a law, or in case it was returned with a veto message just prior to adjournment, action on the veto by the two Houses would be prevented.

But the *presentation* of the measure being made to him—an offer of it to him, a tender of it to him—it can make no difference that he

does not *receive* it. The constitutional requirement is fulfilled and from that moment the delay begins to run and he must act, if his purpose be to veto, within five days.

See Opinion of Justices, 45 N. H. 611, *et seq.*

The bill in question having been presented on July 8th, the Governor was entitled to "five days" for its consideration. Within that period he must return it with his objections, or else it becomes a law the same as if he had signed it, unless the General Assembly, by adjournment, shall prevent its return, etc.

"Adjournment" as here used means final adjournment at the close of the session; not adjournment for the day, or for several days during the session.

Opinion of Justices, 45 N. H. 610.

If the House in which the bill, proposed to be vetoed, originated, should happen not to be in session when the Governor's message arrived, delivery of the bill, with the Governor's objection, to the presiding officer of the body, or to its clerk, would seem, according to the adjudicated cases, to suffice; and in case neither the presiding officer, nor the clerk, can be found, its deposit on the presiding officer's table or desk, or in the office of the clerk would, doubtless, likewise suffice.

See 45 N. H. 609, 610.

The day on which the bill is presented to the Governor is not to be included in the computation of the five days, but the last day of the specified period is to be computed.

Sheets vs. Selden, 2 Wallace 190; Corwin vs. Comptroller, 6 Richardson (S. C.) 394; People vs. Hatch, 33 Ill. 14, 138; Price vs. Whitman, 8 Cal. 412, 417; Iron Mt. Co. vs. Haight, 39 Cal. 541; Dwarris on Statutes, 768, 769; *In re.* Senate Resolution, 21 Pac. Rep. 475 (9 Col. 632).

A "day" in this sense begins at 12 o'clock midnight and extends through twenty-four hours to the next twelve o'clock midnight.

2 Bl. Comm. 141; Black's Law Dictionary, *verbo* "Day"; Opinion of Justices, 45 N. H. 610.

The Governor has the whole of the twenty-four hours constituting a day. He has what is called a natural or astronomical day—not an artificial day. Bouvier, referring to "a day" as a division of time, says in its natural sense it consists of twenty-four hours, or the space of time which elapses while the earth makes a complete revolution upon its axis. Law Dictionary.

See also Abbott's Law Dictionary, *verbo* "Day", and 33 Ill. 137.

In this case the bill is held to have been "presented" to the Governor on July 8th. Excluding that day from computation, the five days given him by the Constitution for its consideration began at twelve o'clock midnight just as the twenty-four hours constituting the 8th of July ended, and the twenty-four hours constituting the 9th of July began.    Ordinarily, then, he was entitled to the twenty-four hours, respectively, of the 9th, 10th, 11th, 12th and 13th of July in which to consider it and return it with his objections.

But the 10th of July, 1898, was Sunday, and of this the Court takes judicial cognizance.

As a consequence, the question next arising for determination, is. does Sunday count in the computation of the five days? Is it to be included or excluded?

If the first, then the Governor's veto of the measure on July 14th came too late; the bill had meanwhile become a law and thereafter its efficacy as such could not be destroyed by the veto message.

If the second, the veto message, reaching the House of Representatives, where the bill originated, at any time during the hours constituting July 14th, was timely.

There is a rule of general, though perhaps not of universal, acceptance, that where a limitation of time is fixed within which a particular act or thing is required to be done, if done at all, after which performance, or the doing of the thing, would be without effect, if the time exceed a week, an intervening Sunday is to be *included* in the computation; if less than a week, Sunday is to be excluded. Am. & Eng. Ency. of Law, vol. 26, p. 10; Haley vs. Young, 134 Mass. 366; Anonymous, 2 Hill (N. Y.) 375; Thayer vs. Felt, 4 Pick. (Mass.) 354; Hannon vs. Tourbillott, 10 Allen (Mass.) 494; 112 Mass. 59.

Consideration of this rule commends its wisdom.

The Federal Constitution allows the President of the United States ten days, *Sundays excepted*, to return a bill with his objections after its presentation to him.

Many of the States of the Union allow ten days, Sundays excepted.

Some allow a less number of days, Sundays excepted, and others a less number of days without mentioning Sunday.

Where there has been an omission to except Sunday in the constitutional provision, and cases have gotten into the courts, no authoritative announcement of the rule to be followed has been laid down, so

far as our research has extended. Indeed, no decision covering the exact case has been found anywhere.

There appear to be no adjudications on this point by this court in the past, though for more than thirty years the constitutional provision has been as it is now, viz:—that if any bill shall not be returned by the Governor *within five days* after its presentation, it shall be a law, etc.—Sunday not mentioned.

The Constitutions of 1868, 1879 and 1898 all so declare, while the four earlier Constitutions—those of 1812, 1845, 1852 and 1864—gave the Governor *ten days* in which to return a bill with his objections, *Sundays excepted.*

It would seem that since the earlier constitutions expressly excepted Sunday and the later constitutions did not, the intention of the framers of the later constitutions was that Sunday should be counted in the five days allowed the Governor.

But this first impression is obliterated when we consider and apply the general rule above referred to.

Under the operation of that rule, had not the framers of the earlier constitutions expressly excluded Sundays from computation in the ten days given the Governor, then Sunday would have been counted; whereas since, in the later constitutions, five days only are allowed— a time which does not *necessarily* include a Sunday—that day (Sunday), happening to be one of the five days, is excluded from the count.

Where the time stipulated was such that it did not necessarily include Sunday, Sunday is excluded from the computation without express mention of the fact; where the time stipulated must necessarily include Sunday, to exclude that day from the computation there must be an express declaration to that effect.

Such is the effect of the general rule laid down, and the framers of the several constitutions under which the State has been governed are presumed to have intended the language and phrases used in consonance therewith.

It follows that if one of the five days accorded the Chief Executive in which to return a bill with his objections happens to be Sunday, the same is not to be computed as one of the constitutional "five days".

This view is strengthened by the general policy of the law in regard to the first day of the week, and by the sentiment prevailing in Christian countries.

In law Sundays are generally excluded as days upon which the performance of any act demanded by the law is not required.   They are held to be *dies non juridici*.

And in the Christian world Sunday is regarded as the "Lord's Day", and a holiday—a day of cessation from labor.

By statute, enacted as far back as 1838, this day is made in Louisiana one of "public rest".   Revised Statutes, Sec. 522; Code of Practice, 207, 763.

This is the policy of the State of long standing and the framers of the Constitution are to be considered as intending to conform to the same.   They had the power to have written in the provisions of the organic law, stipulating the time in which the Governor should return a bill with his objections, words which would have signified an intention to depart in such instance from the policy of the law, but it was not done.   When they ordered merely that he must return the bill within five days after its presentation to him, they must be held to have meant days other than those of "public rest".

Whatever doubt may exist in the judicial mind as to the proper meaning to be given to the words used, it is, we think, safely resolved in favor of that construction sanctioned alike by the policy of the law and by the moral sentiment of the people.

The Governor of the State has five days in which to consider a bill presented to him before he is compelled to return it with his objections, and in this computation of days he may exclude an intervening Sunday or other legal holiday.

He vetoed the bill involved in this controversy on the 14th of July, which was timely, considering that the 10th of July was Sunday.

As it was not thereafter passed by the two Houses of the General Assembly by the requisite constitutional vote, his veto to the contrary notwithstanding, the measure did not become a law, and the case of the relators falls.

In reaching the conclusions announced above the fact that there is no constitutional prohibition against the General Assembly sitting on Sundays has not been lost sight of.   The General Assembly has not heretofore generally held sessions on Sunday, and consideration of what would be the effect of a session on that day, in so far as making the same count, notwithstanding it was Sunday, in the computation

of the five days allowed the Governor in which to return a bill with his objections, does not properly arise herein.

It is, therefore, unnecessary to determine the same now, and opinion is reserved.

Judgment affirmed.

Rehearing refused.