James M. REDMOND and Earl M. Willits, Appellees,

v.

Robert D. RAY, Governor of Iowa, Melvin D. Synhorst, Secretary of State and Wayne A. Faupel, Code Editor, Appellants.

No. 61602.

Supreme Court of Iowa.

July 26, 1978.

Rehearing Denied Aug. 28, 1978.

Richard C. Turner, Atty. Gen., and Richard E. Haesemeyer, Sol. Gen., for appellants.

James M. Redmond, Cedar Rapids, and Earl M. Willits, pro se.

McCORMICK, Justice.

We must here construe and apply Ia. Const. Art. III § 16 which provides the Governor's veto power. Plaintiffs Redmond and Willits are state senators. They allege Senate File 7 (SF 7), passed by the Sixty-seventh General Assembly, became law at midnight on June 3, 1977, because of defendant Governor Ray's failure to act upon it within three days of its May 31, 1977, submission to him. The trial court entered a declaratory judgment that under Art. III, § 16 the Governor had three calendar days, Sunday excepted, from the date of submission within which to veto the bill. Because the Governor did not purport to veto the bill until July 11, 1977, the trial court held it became law without his signature. Defendants Secretary of State Synhorst and Code Editor Faupel were ordered to record and publish SF 7 as a statute of Iowa. Defendants appeal. We affirm the trial court.

Iowa Const. Art. III § 16 provides in relevant part:

Every bill which shall have passed the General Assembly, shall, before it becomes law, be presented to the Governor. If he approve, he shall sign it; but if not, he shall return it with his objections, to the house in which it originated, which shall enter the same upon their journal, and proceed to re-consider it; if, after such re-consideration, it again pass both houses, by yeas and nays, by a majority of two thirds of the members of each house, it shall become a law, notwithstanding the Governor's objections. If any bill shall not be returned within three days after it shall have been presented to him, Sunday excepted, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by adjournment, prevent such return. Any bill submitted to the Governor for his approv-

al during the last three days of a session of the General Assembly, shall be deposited by him in the office of the Secretary of State, within thirty days after the adjournment, with his approval, if approved by him, and with his objections, if he disapproves thereof.

Under this provision a governor ordinarily has three days after a bill is presented to him, not counting Sunday, within which to veto it. If he does not veto it in those three days the bill becomes law without his signature. If he wishes to veto it, he must endorse his disapproval upon the bill and return it before the deadline to the house in which it originated so the legislature may reconsider it and possibly pass it by sufficient votes to override the veto.

One exception is made. A bill does not become law through the governor's failure to sign or veto it within the regular period if the general assembly "by adjournment prevent such return." Bills presented during the last three days of a session come within this exception because final adjournment shortens the available period for returning them. Adjournment would thus prevent the return of bills held by the governor for the full period of consideration. Therefore, instead of becoming law automatically if not approved within that period, bills submitted in the last three days of a session do not become law unless the governor endorses his approval on them. Art. III § 16 gives him 30 days after adjournment within which to decide whether to do so.

This court has explained the exception as follows:

This latter provision is clearly a negative provision. It creates an exception to the rule established by the preceding provision. It provides, in effect, that bills which have been presented to the governor within the last three days of a session of the general assembly, and which he neither signs nor returns with objections before adjournment, become laws only in case he subsequently approves them.

*Darling v. Boesch et al.,* 67 Iowa 702, 707, 25 N.W. 887, 889 (1885).

Because bills which come within the exception are deemed disapproved unless approved within the 30-day period, the exception constitutes a "pocket-veto" provision.

■ Under our constitutional system of checks and balances, the veto right constitutes a qualified negative check upon legislative power. It is essentially a defensive tool, the purpose of which is to help preserve the separation of powers. *Thirteenth Guam Legislature v. Bordallo,* 430 F.Supp. 405, 409 (D. Guam 1977); see Ia. Const. Art. III § 1.

■ As a general rule a veto provision has two purposes: (1) to give the executive suitable opportunity to consider the bills presented to him, and (2) to give the legislature a suitable opportunity to consider the executive's objection to bills and in appropriate cases to seek to pass them over the veto. The provision should generally be construed to further these purposes. *Wright v. United States,* 302 U.S. 583, 596, 58 S.Ct. 395, 400, 82 L.Ed. 439, 446–447 (1938).

■ The pocket veto power is an exception to the general rule that the legislature can override an executive veto. Because it makes the veto power an absolute rather than a qualified negative, it must be limited to the specific purpose it is intended to serve. Otherwise it invades the legislative function and violates the separation of powers. The pocket veto exception should apply only when the legislature by adjournment has prevented the return of a disapproved bill. See *Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 199–200, 511 F.2d 430, 437–438 (1974).

This case presents three questions under Art. III § 16. Two concern the meaning of the provision and the other its application. The first question is whether "the last three days of a session of the general assembly" are legislative or calendar days. The second question is whether an intrasession adjournment of the general assembly during which each house designates an agent to receive messages from the Governor will trigger the pocket veto provision. The third question is whether SF 7 became law under the general veto provision.

Regarding the first question, plaintiffs contend the last three days of a session are its last three calendar days; defendants allege they are the last three session days in which at least one house of the legislature actually meets before formal adjournment. As to the second question, plaintiffs contend such an intrasession adjournment will not trigger the pocket veto provision; defendants assert it will. On the final question, plaintiffs contend SF 7 became law because of the Governor's failure to veto it within three days of its submission to him; defendants maintain it was effectively vetoed.

Before discussing the merits of these questions, we note the similarity in language between the veto provisions in the United States and Iowa Constitutions. In relevant part, U.S. Const. Art. I § 7 provides that, "If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

■■ When the federal and state constitutions contain similar provisions, we usually deem the provisions to be identical in scope, import and purpose. *Chicago Title Ins. Co. v. Huff,* 256 N.W.2d 17, 23 (Iowa 1977). We remain the final arbiters of the meaning of the Iowa Constitution, but we accord special respect and deference to United States Supreme Court interpretations of similar language in the Federal Constitution. See *City of Waterloo v. Selden,* 251 N.W.2d 506, 509 (Iowa 1977).

Such respect and deference are particularly appropriate in the present case. The similarity in language between the pocket veto provisions of U.S. Const. Art. I § 7 and Ia. Const. Art. III § 16 is more than coincidence. The Northwest Ordinance, the organic act for the Wisconsin Territory of

which Iowa was a part, contained a provision modeled on the federal constitutional language, although it gave three instead of ten days for consideration of bills. It provided in relevant part: "If any bill shall not be returned by the Governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Assembly by adjournment prevent its return, in which case it shall not be a law." 5 U.S.Stat. 356, 357. This provision was carried almost intact into the 1846 Constitution of Iowa: "If any bill shall not be returned within three days after it shall have been presented to him, Sunday excepted, the same shall be a law in like manner as if he had signed it, unless the general assembly, by adjournment, prevent such return." 1846 Const. of Iowa, Art. III § 17. The Northwest Ordinance links the comparable provisions of the federal and state constitutions and helps confirm their similarity of meaning and purpose.

The only change in the 1857 Constitution was to add the next sentence of Art. III § 16: "Any bill submitted to the Governor for his approval during the last three days of the General Assembly, shall be deposited by him in the office of the Secretary of State, within thirty days after the adjournment, with his approval, if approved by him, and with his objections, if he disapproves thereof." This sentence was added to enlarge the time for the Governor to consider bills which adjournment prevented him from returning in the regular way. The framers believed the Governor should have more time to consider those bills because so many important bills are passed during the waning hours of a session. The sponsor of the amendment explained its purpose as follows:

Mr. Wilson: * * * My reason for desiring the incorporation of this provision * * * is this: It is well known that all the important business of the general assembly is kept until within the last two or three days of the session, when nearly all of the important bills are passed, and the governor has therefore, no time to examine them thoroughly before the adjournment. For the purpose of giving him that time, I offer this amendment, so that the governor will be required to deposite [sic] all bills submitted to him during the last three days of a session, in the office of the secretary of state, within thirty days after the adjournment with or without his approval as the case may be. 2 W. Lord, Constitutional Debates 1012 (1857).

In net effect the principal difference between the pocket veto provisions of the federal and state constitutions is that the federal provision allows ten days, Sundays excepted, for presidential consideration of all submitted bills, whereas the state provision allows three days, Sunday excepted, for gubernatorial consideration of bills submitted prior to the last three days before adjournment and thirty days for consideration of bills submitted during those last three days. Except for this difference, the history of the state provision shows it was intended to have the same meaning as the federal provision.

With this background, we turn to the questions in this case.

I. *What are "the last three days of a session" under Art. III § 16?* In construing a constitution, our purpose is to ascertain the intent of the framers. *Ex Parte Pritz,* 9 Iowa 30, 32 (1858) ("What thought was in the mind of those making the Constitution * * * is the great leading rule of construction.").

We must first look at the words employed, giving them meaning in their natural sense and as commonly understood. When necessary for a fuller understanding we may examine constitutional history. We may also note the object to be attained or the evil to be remedied as disclosed by circumstances at the time of adoption. *Rudd v. Ray,* 248 N.W.2d 125, 129–130 (Iowa 1976).

The word "days" appears three times in the relevant paragraph of Art. III § 16. It is first used in stating the general principle that a bill becomes law if the governor does

not return it "within three days after it shall have been presented to him, Sunday excepted * * *." It is next used in providing the exception for bills "submitted to the Governor for his approval during the last three days of a session * * *." It is finally used in defining the period for gubernatorial action when the exception applies as "thirty days after the adjournment."

■ The first usage clearly refers to calendar days which are to be counted consecutively, but not including Sunday. The controlling rule is that, "Where a certain number of days is prescribed within which the governor must either approve, veto, or return a bill, such days are to be computed by excluding the day on which the bill was received and including the last day; and the time must be measured by calendar days." 82 C.J.S. Statutes § 49 at 79. See 73 Am.Jur.2d Statutes § 49 at 310.

The leading case in support of this rule is *Okanogan Indians v. United States,* 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), commonly referred to as *"The Pocket Veto Case"*. The case involved a problem under the analogous language in U.S. Const. Art. I § 7. ("If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the same shall be a Law * * *."). Petitioners in the case contended that the language "Within ten Days (Sundays excepted)" meant days when Congress was in session rather than consecutive calendar days. In rejecting that contention the Court said:

> There is plainly no warrant for adopting the suggestion of counsel for the petitioners * * * that the phrase "within ten Days (Sundays excepted)," may be construed as meaning, not calendar days, but "legislative days," that is, days during which Congress is in legislative session—thereby excluding all calendar days which are not also legislative days from the computation of the period allowed the President for returning a bill. The words used in the Constitution are to be taken in their natural and obvious sense [Cita-

tion], and are to be given the meaning they have in common use unless they are very strong reasons to the contrary. [Citation]. The word "days," when not qualified, means in ordinary and common usage calendar days. This is obviously the meaning in which it is used in the constitutional provision, and is emphasized by the fact that "Sundays" are excepted. There is nothing whatever to justify changing this meaning by inserting the word "legislative" as a qualifying adjective. 279 U.S. at 679, 49 S.Ct. at 466, 73 L.Ed. at 898.

State courts confronting the same issue have uniformly reached the same conclusion. *State v. Joseph,* 175 Ala. 579, 57 So. 942 (1911); *State v. Sessions,* 84 Kan. 856, 115 P. 641 (1911); *State v. Michel,* 52 La. Ann. 936, 27 So. 565 (1900); *In re an Act Concerning Public Utilities,* 83 N.J.L. 303, 84 A. 706 (1912); *McAlester v. Oklahoma Tax Commission,* 174 Okl. 322, 50 P.2d 647 (1935).

■ Thus, the period for gubernatorial consideration of bills under the general veto provision of Art. III § 16 is three consecutive calendar days, Sunday excepted.

■ Furthermore, in specifying the 30-day period for gubernatorial consideration of bills under the pocket veto provision in their third usage of the word "days", the framers also plainly meant consecutive calendar days. Because adjournment marks the beginning of the 30-day period, it could not be measured in legislative days. Of course, Sundays are not excepted from this period.

Against this background we must decide whether the framers meant legislative rather than calendar days in their intervening reference to "days" in making the pocket veto provision applicable to "[a]ny bill submitted to the Governor * * * during the last three days of a session * * *."

The language of Art. III § 16 and its construction in *Darling v. Boesch, supra,* show the pocket veto exception is intended to control when adjournment prevents the return of bills under the general veto provi-

sion giving the governor three days, Sunday excepted, to consider them. Only then does adjournment interfere with the return of disapproved bills under the general provision.

Because the period of gubernatorial consideration under the general veto provision is measured in calendar days, "the last three days of a session" must also refer to calendar days. If the last three days of a session included only days in which at least one house of the legislature actually met for conducting legislative business, "the last three days of a session" would involve a period longer than three calendar days whenever the legislature did not meet daily. Excluding calendar days when at least one house of the legislature did not meet would create a conflict between the general veto provision and its exception because the exception would purport to apply to situations when the general provision could operate. Instead of being mutually exclusive, the provisions would overlap. This construction would contradict the principle favoring the general veto provision.

■■■ We conclude that the three cited references to "days" in Art. III § 16 are to calendar days rather than legislative days. As a result, we hold "the last three days of a session" are the last three calendar days before final adjournment of a legislative session.

II. *Does an intrasession adjournment during which an agent is designated to receive messages from the Governor prevent the return of vetoed bills?* Two United States Supreme Court cases have discussed what constitutes an adjournment which is sufficient to prevent the executive from returning a bill within the meaning of the federal pocket veto provision. They are *The Pocket Veto Case, Okanogan Indians v. United States,* 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), and *Wright v. United States,* 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938).

In *The Pocket Veto Case* the Court upheld a pocket veto on the ground that an intersession *sine die* adjournment of the Sixty-ninth Congress prevented the return

of a bill by President Coolidge. The Court said not every adjournment is sufficient to trigger the pocket veto clause. It is not sufficient unless it prevents the return of the bill to the house in which it originated within the time allowed. "It is clear * * that since the President may return a bill at any time within the allotted period, he is prevented from returning it * * * if by reason of the adjournment it is impossible for him to return it to the House in which it originated on the last day of that period." 279 U.S. at 681, 49 S.Ct. at 467, 73 L.Ed. at 898.

In *Wright* the Court held an intrasession adjournment of the originating house, the Senate, was not an adjournment which prevented return of a disapproved bill. The Court relied on the brevity of the recess and the fact the Senate specially designated an agent to receive messages for it during that period. Relevant here is the following statement of the Court:

> There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent of the legislative body? To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations, and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right. 302 U.S. at 590, 58 S.Ct. at 398, 82 L.Ed. at 443.

The *Wright* case recognizes that normal vetoes and pocket vetoes are mutually exclusive devices. The pocket veto is applicable only when the legislative body has adjourned and when the adjournment is of such a kind that it prevents the return of a

vetoed bill. This case is considered to be a substantial modification of *The Pocket Veto Case*. E. Kennedy, *Congress, The President, and The Pocket Veto,* 63 Va.L.Rev. 355, 370 (1977).

Decisions from other states in similar circumstances under comparable constitutional provisions are in accord with *Wright.* The prevailing rule is that a temporary adjournment of the legislature or of the originating house does not prevent return of the bill. Only an adjournment *sine die* or which terminates the *organized existence* of the legislature will do so. *Harpending v. Haight,* 39 Cal. 189 (1870); *State v. Michel,* 52 La. Ann. 936, 27 So. 565 (1900); *Wood v. State Adm. Bd.,* 255 Mich. 220, 238 N.W. 16 (1931); *State ex rel. Putnam v. Holm,* 172 Minn. 162, 215 N.W. 200 (1927); *Soldiers' Voting Bill,* 45 N.H. 607 (1864); *Corwin v. Comptroller Gen.,* 6 S.C. 390 (1875); *Johnson City v. Tennessee Eastern Elec. Co.,* 133 Tenn. 632, 182 S.W. 587 (1915); *State ex rel. Sullivan v. Dammann,* 221 Wis. 551, 267 N.W. 433 (1936). See also *Hawaiian Airlines v. Public Util. Comm.,* 43 Haw. 216 (1959); *Opinion of Justices,* 3 Mass. 567 (1791); *Miller v. Hurford,* 11 Neb. 377, 9 N.W. 477 (1881); *Hequembourg v. City of Dunkirk,* [56 N.Y.S. 550], 49 Hun. 550, 2 N.Y.S. 447 (1888).

We hold that an intrasession legislative adjournment during which an agent is designated to receive messages from the governor is not an adjournment which prevents return of disapproved bills and hence does not trigger the pocket veto provision of Art. III § 16.

III. *Does the general rule or the exception apply in this case?* The facts in the present case were stipulated. We will recite those which are relevant.

It has proved to be physically impossible for the legislature to put bills passed late in the session into final form for presentation to the governor before *sine die* adjournment.

In order to allow the necessary time, the legislature for many years engaged in a fictional procedure called "clock-stopping". The legislature's clocks were stopped on the last active legislative day. The members went home while staff prepared bills in enrolled form. As they were prepared they were presented to the governor. In two or three weeks the legislature resumed its session long enough to restart the clocks and adjourn *sine die.* The legislative records made it appear these bills were submitted to the governor on the last active legislative day while in fact they were presented to him from one to 28 days later. The effect was to give the legislature time to prepare bills in enrolled form at the expense of the governor's 30-day period to consider them. That period started on the last active legislative day because the *sine die* adjournment purported to occur as of that date.

Governor Ray's staff complained to the legislative staff that this procedure shortened the period intended to be available to the Governor under Art. III § 16 for consideration of bills submitted to him on the last three days of the legislative session.

In an effort to solve this problem the Sixty-seventh General Assembly established a new procedure in Senate Concurrent Resolution 27 (SCR 27). It provided for an intrasession adjournment from May 20, 1977, until June 13, 1977. It directed the legislative staff to enroll bills during the adjournment for presentation to the Governor on June 13, 1977. Then the legislature would adjourn *sine die* on that date.

In theory this procedure would give the legislature time to enroll its bills, and it would give the Governor 30 days after June 13 to consider them. It would accomplish the purpose of clock-stopping without shortening the Governor's time for considering the bills.

In relevant part, SCR 27 provided as follows:

1. Upon the adjournment on May 20, 1977, the Senate and House of Representatives shall sit upon their adjournment at 10:00 a. m. on June 13, 1977.

2. The Secretary of the Senate and Chief Clerk of the House are directed to enroll all bills finally passed by the Senate and House of Representatives which

have not been submitted to the Governor for his approval during the last three days of the session prior to the adjournment of May 20, 1977 and they be made ready to present to the Governor by a delegation from the Senate and from the House of Representatives on June 13, 1977.

\* \* \* \* \* \*

4. After the adjournment on May 20, 1977, the Secretary of the Senate and Chief Clerk of the House are directed to refuse to receive for filing any item, excepting only messages from the other body and messages from the Governor.

5. The adjournment of the Senate and House of Representatives on June 13, 1977 shall constitute the sine die adjournment of the 1977 Session of the Sixty-seventh General Assembly. The 1978 Session of the Sixty-seventh General Assembly shall convene, as provided by the Constitution, on January 9, 1978.

Unfortunately a misunderstanding developed. The senate secretary believed the only enrolled bills which were to be held for presentation on June 13 were those bills passed during the three days ending May 20. The Governor's staff, relying on the language of SCR 27, believed all bills which had not been presented to the Governor by May 20 were to be held for presentation until June 13 regardless of when passed, with no bills to be presented during the intrasession adjournment.

In accordance with his understanding, the secretary of the senate wrote the Governor's administrative assistant on May 25, notifying him that 23 senate bills which had been passed prior to May 18 would be submitted to Governor Ray during the intrasession adjournment. Forty-seven other bills were passed in the period May 18–20 and would be presented June 13. The senate secretary added that he believed the Governor would have only three days after presentation to act on the 23 bills to be submitted before June 13.

On May 31 a legislative staff member called a Governor's staff member and asked if the Governor would accept the bills ready for delivery. The Governor's assistant responded affirmatively and, despite a legislative offer to deliver a few of the bills each day, told the legislative staff member to submit all bills which were ready.

On June 2 the Governor's assistant wrote the senate secretary expressing hope the procedure under SCR 27 would solve the problem of prior years. However, he contended the Governor would have 30 days from final adjournment to consider the 23 bills to be submitted before June 13.

Seventeen of these bills were submitted to the Governor on May 31, five on June 6, and one on June 10. SF 7 was one of the bills submitted on May 31. Legislative action had been completed on it on May 17. It was a bill relating to contract and bidding requirements for county buildings. Governor Ray endorsed his disapproval on the bill on July 10 and delivered it by letter to the secretary of state on July 11.

Plaintiffs contend SF 7 comes within the general veto provision of Art. III § 16. They argue the Governor had three days, Sunday excepted, after May 31, 1977, within which to disapprove and return it. Because he did not do so they assert SF 7 automatically became law as of midnight June 3, 1977. Defendants counter with a contention the pocket veto exception applies to SF 7. On that basis they allege the Governor had 30 days after June 13 to consider the bill. Consequently they insist his July 11 veto was timely.

Defendants' position rests on two premises. The first is that the last three days of the session included May 18, May 19, "and an artificial day consisting of the special recess from May 20 to June 13." Appellants' brief p. 13. The second premise is that the May 20 intrasession adjournment prevented the return of SF 7.

We reject defendants' first premise on the basis of our construction of Art. III § 16 in division I. The last three days of a session are the last three calendar days before adjournment. For purposes of this premise defendants assume final adjournment occurred June 13. Hence, if final

adjournment occurred then, the last three days of the session were June 11, 12 and 13. Because SF 7 was submitted to the Governor on May 31, it was not submitted on one of the last three days of the session. Therefore the pocket veto exception was not triggered on this ground.

Defendants' second premise is not consistent with their first nor is it reconcilable with their theory that the Governor had 30 days after June 13 to consider SF 7. This is because if the return of SF 7 was prevented by the May 20 adjournment, the 30-day period for consideration would commence May 21. The bill would have been pocket-vetoed by the Governor's failure to approve it before midnight on June 19.

In any event, this premise depends on finding merit in defendants' contention that the May 20 adjournment prevented return of SF 7 within the meaning of Art. III § 16, and we reject this contention on the basis of our holding in division II.

An arrangement for return of bills during the intrasession recess like that in *Wright v. United States*, supra, was made in the present case. Paragraph four of SCR 27 specifically authorized the secretary of the senate and house clerk to receive messages from the Governor. The purpose of this provision was to permit the return of vetoed bills. Under the principle recognized in *The Pocket Veto Case* and applied in *Wright*, the May 20 adjournment did not trigger the pocket veto clause because it did not prevent the return of bills on the last day of the regular period for consideration. Moreover, no basis exists for suggesting the legislature could not have exercised its right of reconsideration of any disapproved bills returned during the intrasession recess.

This case is squarely within the holding of *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974), under the analogous federal constitutional provision. The intrasession adjournment in that case was for the Christmas holidays. The Senate had authorized its Secretary to receive messages from the President during adjournment. At issue was whether the adjournment prevented the return of a bill which

had been presented to the President before adjournment. He contended it had been pocket-vetoed. However, unless the adjournment prevented its return it would have become law just as SF 7 in the present case. In rejecting the President's contention, the court said:

Our study of the constitutional text itself, its history and previous judicial interpretations of it convinces us that an intrasession adjournment of Congress does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential messages during the adjournment. Since the adjournment in question falls into this category, we affirm the district court's declaration that S. 3418 became law on December 25, 1970. 167 U.S.App.D.C. at 199, 511 F.2d at 437.

See also *Kennedy v. Jones*, 412 F.Supp. 353 (D.D.C.1976).

Through the same reasoning the legislature in the present situation did not deprive the Governor of his ability to return SF 7 nor did it disable itself from reconsidering it if it were returned, within the meaning of Ia.Const. Art. III § 16.

We find no merit in either premise upon which defendants rely in contending the pocket veto exception of Art. III § 16 was applicable to SF 7. Instead we agree with the trial court that plaintiffs are correct in their contention SF 7 was subject to the general veto provision. It became law when not disapproved before midnight June 3, 1977. The trial court did not err in entering the declaratory judgment and mandamus order.

In reaching this conclusion we are aware of the sensitivity with which we must decide inter-branch disputes. The efficient functioning of government depends on adherence by each branch to the delicate balance which must be maintained under the separation of powers precept. It also depends on cooperation among the branches and mutual respect for the system of checks and balances.

The record in the present case displays an effort at accommodation between the legislature and Governor. It shows lines of communication were open between them from the beginning of the legislative session. The legislature obtained dates from the Governor's office when he would be out-of-state, agreed not to submit bills to his office during these absences, and adjusted presentation of bills during the session accordingly. SCR 27 arose from the same spirit.

We agree with the trial court that the misunderstanding which occurred relating to the 23 bills which were submitted to the Governor during the intrasession adjournment is attributable to misleading language in SCR 27. However, this problem did not stem from bad faith or improper motives. We have no basis to speculate what the result would be if the purpose of SCR 27 had been to prevent the pocket veto provision from operating as to bills which otherwise would have been presented to the Governor on one of the last three calendar days of the session.

In any event, defendants do not suggest Art. III § 16 can be construed to force a legislature to adjourn *sine die* before it is ready to do so, nor do they contend it dictates at what time during a session a legislature must pass bills and present them to the Governor. Any legislature is free, without a resolution like SCR 27, to remain in session after it has passed the bulk of its bills, present those bills to the governor when the bills are enrolled, and then remain in session three more days before adjourning. If the problem with Art. III § 16 is that the general veto provision does not provide adequate time for executive consideration of bills, the solution is to amend the provision to enlarge the time rather than to deprive the legislature of its right of reconsideration of vetoed bills by misconstruing the pocket veto exception to make it applicable in circumstances to which it does not extend.

The framers of Ia. Const. Art. III § 16 plainly foresaw the problem created for the Governor when he is confronted with a mass of legislation passed in the closing days of a session. However, they did not appear to foresee the mechanical problem which a modern legislature faces in attempting to enroll today's huge volume of massive and complex bills. Procedures under SCR 27 were calculated to confront that problem in a manner consistent with the Constitution. We find that, despite the misunderstanding fostered by the legislature's choice of language, the procedure employed in submitting SF 7 to the Governor did not make it subject to the pocket veto exception in Art. III § 16.

AFFIRMED.

MOORE, C. J., and MASON, UHLENHOPP and HARRIS, JJ., concur.

RAWLINGS, LeGRAND, REES and REYNOLDSON, JJ., dissent.

RAWLINGS, Justice (dissenting).

Being unable to agree with the majority's ultimate reasoning in Division III or the result reached, I respectfully dissent. It is also to me apparent the majority draws an erroneous conclusion fraught with calculably troublesome futuristic problems. I would therefore reverse and in so doing hold the legislature's May 20th intra-session adjournment triggered art. III, § 16's pocket veto clause.

I. Preliminarily, I have no quarrel with the substance of the majority's Division I and II or the three principal federal cases, *Okanogan, Methow, etc., Tribes v. United States*, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (*The Pocket Veto Case*); *Wright v. United States*, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938); and *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974). The Iowa Constitution, even more clearly than its federal counterpart, limits return-preventing adjournments to those which are final or *sine die*. This is because our framers specifically limited use of the pocket veto to "[a]ny bill submitted * * during the last three days of a session". I also agree that those are calendar not session or legislative days.

II. On the other hand, I take issue with the majority's application of those general rules to the instant uncontroverted facts. In brief, the May 20th adjournment is easily distinguishable from *Wright, Kennedy v. Sampson,* and almost every supportively cited state court decision in one critical aspect: When the adjournment ended June 13th, legislative business did not resume and such was never really intended.

As *The Pocket Veto Case* observes, 279 U.S. at 680, 49 S.Ct. at 467, the determinative question is not what label to give this adjournment but whether it is one which prevents return of a vetoed bill to the legislature. And as amplified by *Wright* and *Kennedy v. Sampson,* an adjournment prevents return only if the reason for such return—legislative reconsideration—is no longer possible. *Wright,* 302 U.S. at 596–597, 58 S.Ct. at 401; *Kennedy v. Sampson,* 167 U.S.App.D.C. at 201–203, 511 F.2d at 439–441.

Normally, reconsideration is possible until final adjournment and the wording of art. III, § 16 reflects that understanding. But here reconsideration was hardly possible after May 20th. On that date the legislature completed its business, disbanded and went home. As a practical matter, the June 13th meeting was never meant to be other than a ceremonial finish.

Closest on point is *The Pocket Veto Case.* There the House adjourned *sine die* on July 3, 1926, eight days after presentation, but the Senate adjourned to November 10th, sat as a court of impeachment during the interim, then reconvened and immediately adjourned *sine die.* Yet there was no question that July 3rd was the congressional session's final adjournment for purposes of the veto issue. 279 U.S. at 672 & n. 1, 49 S.Ct. at 464. In contrast, the intra-session adjournment in *Kennedy v. Sampson* was merely a Christmas recess, followed by months of active and official congressional business.

The majority bridges this sizeable gap between *Kennedy v. Sampson* and our case by concluding that nothing prevented the legislature from conducting business on June 13th and for several days thereafter, thus enabling it to reconsider SF 7. From a strictly legal viewpoint this may be true. Realistically, however, such an extension of the legislative session is burdened with difficult obstacles such as producing, perhaps on very short notice, a quorum in both houses. In sum total, I am persuaded no reconsideration-enabling extension was intended when SCR 27 was adopted. Consequently, we should hold the May 20th intrasession adjournment prevented return of SF 7 and thereby triggered the pocket veto clause.

III. Even if I were convinced a last minute recall of the legislative troops for a June 13th reconsideration and override vote was both intended and possible, it is to me self-evident the spirit of art. III, § 16, requires the same result.

As the majority properly observes, Iowa's Constitution scrupulously safeguards the right of our legislative branch to reconsider vetoed bills. Nevertheless, it is just as important to our constitutional framework that time granted the executive be not truncated. This is especially true under Iowa's version of the pocket veto which serves an additional purpose, not contemplated by the federal framers, therefore not considered by federal courts. The majority recognizes art. III, § 16 grants the Governor an additional twenty-seven days consideration right when the pocket veto clause is triggered, but fails to give it substance. I find it instantly controlling.

As evidenced by the majority's quotation of the 1857 constitutional debates, the involved time extension's purpose is not open to conjecture. The Governor is thereby provided sufficient opportunity to digest the flood of legislation passed during a session's closing days in order to intelligently approve or veto. This problem, prompting the framers' concern, has survived passage of time. Stipulated evidence reveals that in an average recent year more than a third of the bills passed were presented to the Governor during the session's last three days. In 1977 it was even worse: 113 of the 165 bills passed were presented after May 18th.

Of course, these eleventh hour enactments also pose a problem for the legislature, because history has proven it is physically impossible to put all enacted bills into final, official form for presentation to the Governor before *sine die* adjournment. Due to the fact our Constitution provides no remedy for this legislative problem a device such as SCR 27 has become necessary in order to extend the legislature's official life beyond close of official business until all clerical tasks are completed. Surely the legislature's authority to employ such a device or its desirability is not open to question. But SCR 27, as interpreted by the legislative staff and plaintiffs, serves to preclude intended and purposeful application of the pocket veto clause. Therefore, it stands in unacceptable derogation of the separation of powers and in my view cannot be tolerated.

Pertinent portions of SCR 27 are set forth in the majority opinion and need not be here repeated. The majority also describes the confusion as to what was said versus what was meant and done. However, my problem with plaintiffs' interpretation of SCR 27 and what was done is that the legislature thereby gained reconsideration rights over a bill which its staff could not prepare in time for gubernatorial submission *before* the last three business days. Yet SF 7 is among the very bills about which the framers were concerned when the thirty day amendment to art. III, § 16, was adopted.

If plaintiffs' interpretation of SCR 27 is accorded constitutional approval, then intra-session adjournments may be so abused as to completely abrogate the pocket veto clause.[1] Illustratively, there is no way to distinguish between SCR 27 and a similar resolution which would direct presentation of all bills on a certain date and provides for *sine die* adjournment four days later.

IV. Furthermore, it is no answer that political realities make such legislative abuses unlikely. Iowa's Constitution is the foundation of its government and our courts must keep it flexible enough to withstand the pressures of time and political aberration. Concerned with the delicate balancing act required by the veto power another court has aptly cautioned:

"Within the constitutional scheme, there is large leeway, through mutual arrangement and understanding, for the President and Congress to accommodate each other's needs and interests. But the veto provisions of the Constitution were also designed to apply in eras of hostility, coolness, partisan tactics, or simple lack of concern." *Eber Bros. Wine & Liquor Corporation v. United States*, 337 F.2d 624, 629, 167 Ct.Cl. 665, 673 (1964).

I do not mean to hereby impugn in any way the motives of plaintiffs, the Sixty-Seventh General Assembly, or its clerical staff. At the Governor's request the legislature attempted to find a better solution to its clerical backlog than clock-stopping. Obviously, these internal problems are for the legislature to remedy as it alone sees fit, but this must be done in a manner respectful of the veto power's boundaries. The SCR 27 intra-session adjournment existed for one and only one intended purpose: completion of staff operations after official legislative business was finished. It cannot be properly used, unintentionally or otherwise, to accomplish in staff offices

---

1. The present case is a prime example of the prudential limits beyond which otherwise valuable federal precedent should not be stretched in construing our Constitution. The virtually complete abrogation of pocket vetoes suggested by *Kennedy v. Sampson* and urged by commentators is simply not appropriate in Iowa. We have a duty to interpret *our* veto clause and give effect to its relatively unique verbiage. Cf. *State v. Longbine*, 263 N.W.2d 527, 529 (Iowa 1978) (McCormick, J., concurring specially); *In Interest of Johnson*, 257 N.W.2d 47, 49 (Iowa 1977) (McCormick, J., concurring specially); *Chicago Title Ins. Co. v. Huff*, 256 N.W.2d 17, 23 (Iowa 1977). See generally A. Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Va.L.Rev. 873, 874–879 (1976). I would have no objection to a device, be it a permanent statute or an annual resolution, which in fact permitted legislative reconsideration over any and all vetoed bills, as long as it respected the constitutional mandate that the Governor have adequate time to consider any last minute flood of legislation. Because SCR 27 carries no such protections I cannot approve it.

what legislators failed to do on their respective house floors: pass SF 7 early enough in the session to ensure presentation, return and reconsideration before session's end.

Because SCR 27, as interpreted and effectuated by the legislature and approved by the majority, indirectly but significantly infringed upon powers reserved to the Governor pursuant to art. III § 16, I conclude the May 20th intra-session adjournment prevented return of SF 7 thereby triggering the pocket veto clause. Trial court's determination that the veto of SF 7 was invalid as untimely should not be allowed to stand.

LeGRAND, REES and REYNOLDSON, JJ., join this dissent.