# IN THE SUPREME COURT OF IOWA

No. 14–0553

Filed April 15, 2014
Amended August 21, 2014

**NED CHIODO,**

Appellant,

vs.

**THE SECTION 43.24 PANEL CONSISTING OF: SECRETARY OF STATE MATTHEW SCHULTZ, AUDITOR OF STATE MARY MOSIMAN** and **ATTORNEY GENERAL THOMAS MILLER,**

Appellee,

**ANTHONY BISIGNANO,**

Intervenor-Appellee.

---

Appeal from the Iowa District Court for Polk County, David L. Christensen, Judge.

In an expedited appeal from a ruling on judicial review, the petitioner challenges the denial of his objection to the intervenor's eligibility to seek elective office. **AFFIRMED.**

Gary D. Dickey Jr. of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Meghan L. Gavin, Assistant Attorney General, for appellees.

Joseph C. Glazebrook of Glazebrook, Moe, Johnston & Hurd LLP, Des Moines, for intervenor-appellee.

Rita Bettis and Randall C. Wilson, Des Moines, for amicus curiae American Civil Liberties Union of Iowa Foundation, Inc.

**CADY, Chief Justice.**

In this appeal, we must decide if the Iowa Constitution disqualifies a person who has been convicted of the crime of operating while intoxicated (OWI), second offense, from holding a public office. The state elections panel (Panel) found the intervenor in this case was not disqualified, as did the district court on judicial review of the Panel decision. On our review of the district court decision, we hold a person convicted of the crime of OWI, second offense, is not disqualified from holding a public office in Iowa. We affirm the decision of the district court.

## I. Background Facts and Proceedings.

On March 11, 2014, Anthony Bisignano filed an affidavit of candidacy for Iowa Senate in District 17 with the Iowa Secretary of State. District 17 covers a portion of Polk County, and Bisignano sought the Democratic nomination. Two days later, Ned Chiodo filed an objection to the affidavit of candidacy filed by Bisignano. Chiodo had previously filed an affidavit of candidacy for Iowa Senate in District 17. He also sought the Democratic nomination, along with another candidate, Nathan Blake. Blake is an assistant attorney general in the Iowa Department of Justice.

In the objection, Chiodo claimed Bisignano was disqualified from holding public office based on his prior conviction of the crime of OWI, second offense. Chiodo requested the Secretary of State not to place Bisignano's name on the primary ballot.

Bisignano was convicted in district court of OWI, second offense, on December 9, 2013. The district court sentenced him to a term of incarceration not to exceed two years, but suspended all but seven days of the incarceration and placed him on probation with the Iowa Department of Correctional Services for two years.

The objection filed by Chiodo with the Secretary of State was heard by the three-person panel on March 19, 2014. On March 21, the Panel denied the objection.

Chiodo filed a petition for judicial review of the decision of the Panel with the district court. On April 2, the district court affirmed the decision of the Panel. Chiodo promptly filed a notice of appeal. We granted expedited review.

Chiodo raises two issues for review on appeal. First, he argues Attorney General Thomas Miller was required to recuse himself from considering the objection as a part of the three-person panel due to a conflict of interest. Second, he claims a criminal conviction for an aggravated misdemeanor constitutes an infamous crime, which disqualifies a person with such a conviction from holding office under article II, section 5 of the Iowa Constitution.

We decline to consider Chiodo's challenge to the Attorney General's participation on the Panel. In oral argument, Chiodo acknowledged he does not assert this claim to seek a remedy in this case. We thus proceed only to consider Chiodo's main contention that the Panel's ruling that OWI, second offense, was not an infamous crime was contrary to the Iowa Constitution.

## II. Scope of Review.

The Iowa Code authorizes judicial review of agency decisions that prejudice the "substantial rights" of the petitioner.[1]     Iowa Code

---

[1]In the district court, the Panel argued the proper avenue for judicial review of its action was writ of certiorari. The district court apparently disagreed, reasoning we would employ the same standards to review a claim brought under either procedural mechanism. The Panel has not appealed this aspect of the district court's decision, and its resolution is not germane to our determination in this expedited appeal. Accordingly, we assume, without deciding, the Panel and the Attorney General are agencies subject to the provisions of chapter 17A.

§ 17A.19(1), (10) (2013); *accord Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). Among the grounds upon which a district court may grant relief is action that is "[u]nconstitutional on its face or as applied" or action "based upon a provision of law that is unconstitutional on its face or as applied." Iowa Code § 17A.19(10)(*a*). "[W]e review agency action involving constitutional issues de novo." *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 344 (Iowa 2013).

## III. Discussion.

The laws of this state provide that a person who seeks public office must be an "eligible elector." Iowa Code § 39.26. An "eligible elector" under our law is a person who possesses the qualifications to be a registered voter. *Id.* § 39.3(6). The qualifications to vote have roots in our Iowa Constitution and address concepts of citizenship, age, and residency. *See* Iowa Const. art. II, § 1. In short, a person who runs for public office in Iowa must be a person who can vote in Iowa. Thus, restrictions on those who run for office are actually restrictions on those who can vote.

Voting is a fundamental right in Iowa, indeed the nation. *See Devine v. Wonderlich*, 268 N.W.2d 620, 623 (Iowa 1978). It occupies an irreducibly vital role in our system of government by providing citizens with a voice in our democracy and in the election of those who make the laws by which all must live. *See Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535, 11 L. Ed. 2d 481, 492 (1964). The right to vote is found at the heart of representative government and is "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S. Ct. 1362, 1381, 12 L. Ed. 2d 506, 527 (1964); *accord Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071, 30 L. Ed. 220, 226 (1886).

While our constitution underscores the importance and respect for the voting process that gives voice to democratic governance, it does not extend that voice to every person. As with all rights, the right to vote is not absolute. Instead, two classes of people in Iowa are disqualified from voting. Under article II, section 5, "[a] person adjudged mentally incompetent to vote or a person convicted of any infamous crime shall not be entitled to the privilege of an elector." Iowa Const. art. II, § 5.

As with many other terms and phrases in our constitution, our founders did not give us a definition of the phrase "infamous crime." From the beginning of our constitutional journey as a state, as now, the courts have been given the role to interpret the constitution and provide the needed definition so our constitutional principles can be applied to resolve the disputes we face today. *See Varnum v. Brien*, 763 N.W.2d 862, 875 (Iowa 2009). Our founders not only declined to list specific crimes that would disqualify people from participating in the election process, they did not use traditional classes or categories of crimes such as felony or misdemeanor to disqualify a voter. Instead, our founders gave us the phrase "infamous crime." The foundational question we face today is whether the crime of OWI, second offense, is an infamous crime.

We do not begin our resolution of this case on a clean slate. We have considered the meaning of the phrase "infamous crime" in the past and have given it a rather direct and straightforward definition. We have said "[a]ny crime punishable by imprisonment in the penitentiary is an infamous crime." *State ex rel. Dean v. Haubrich*, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957); *accord Blodgett v. Clarke*, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam); *see also Flannagan v. Jepson*, 177 Iowa 393, 399–400, 158 N.W. 641, 643 (1916).

If this definition is applied to resolve the question in this case, we need little additional analysis. Our legislature has defined the crime of OWI, second offense, as an aggravated misdemeanor. Iowa Code § 321J.2(2)(*b*). An aggravated misdemeanor has been defined by our legislature to be a crime punishable by imprisonment within our state correctional system. *See id.* § 321J.2(4)(*a*); *id.* § 901.7. Thus, under our existing interpretation of the phrase "infamous crime," a strong argument exists that Bisignano is disqualified from running for public office, as well as participating in our democracy as a voter. He claims, however, our prior interpretation of the phrase "infamous crime" is incorrect. The Panel agreed with this claim, and we now proceed to consider it.

Our judicial process is built on the general principle of stare decisis. We normally build upon and follow our past cases. Yet, our experience has revealed times when our precedents must be overturned. *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014). Within a system of justice, courts cannot blindly follow the past. Instead, we are obligated to depart from past cases when they were erroneously decided. Thus, we turn to review our prior cases that have interpreted the phrase "infamous crime" to determine if those cases were correctly decided.

We first considered the phrase "infamous crime" outside the context of article II, section 5. In *Flannagan*, the defendant continued to maintain a "liquor nuisance" after the district court entered a decree enjoining him from doing so. 177 Iowa at 395, 158 N.W. at 641. In response, the district court held the defendant in contempt of court for failing to comply with the injunction and sentenced him to one year of hard labor in the state penitentiary. *Id.* at 395, 158 N.W. at 641–42.

On appeal, we were required to address the procedural rights afforded under the constitution to a person found in contempt and

sentenced to the penitentiary for that contempt. *See id.* at 398–402, 158 N.W. at 642–44. Because the Iowa Constitution limits the imposition of involuntary servitude to "punishment of crime," Iowa Const. art. 1, § 23, the case turned on whether contempt was a crime. *See Flannagan,* 177 Iowa at 399, 158 N.W. at 643. To make this determination, we considered the "infamous crime" phrase found in the Fifth Amendment to the United States Constitution. *See id.* at 399–401, 158 N.W. at 643–44. In turn, we relied heavily on the case of *Ex parte Wilson. See id. See generally Ex parte Wilson,* 114 U.S. 417, 422–23, 5 S. Ct. 935, 937–38, 29 L. Ed. 89, 91 (1885).

In *Ex parte Wilson,* the Court noted that two concepts of infamy existed prior to the Fifth Amendment. 114 U.S. at 422, 5 S. Ct. at 937, 29 L. Ed. at 91. These two concepts addressed distinct circumstances. *See id.* (citing Lord William Eden Auckland, *Principles of Penal Law* ch. VII, § 6, at 54 (London 1771)). One concept focused on the mode of punishment for a person who commits an infamous crime; the other dealt with disqualification of a person who committed an infamous crime from being a witness. *See id.* "[T]he infamy which disqualified a convict to be a witness depended upon the character of his crime, and not upon the nature of his punishment." *Id.* at 422, 5 S. Ct. at 937–38, 29 L. Ed. at 91. The list of infamous crimes recognized at the time included

> treason, felony, forgery, and crimes injuriously affecting by falsehood and fraud the administration of justice, such as perjury, subornation of perjury, suppression of testimony by bribery, conspiring to accuse one of crime, or to procure the absence of a witness, [but not] . . . private cheats, such as the obtaining of goods by false pretenses, or the uttering of counterfeit coin or forged securities.

*Id.* at 423, 5 S. Ct. at 938, 29 L. Ed. at 91. Because the latter definition of infamy—pertaining to disqualification—was "already established" at

the time the Fifth Amendment was ratified, the Supreme Court reasoned the Fifth Amendment's definition must incorporate the infamous-punishment standard instead. *See id.* at 422–24, 5 S. Ct. at 937–38, 29 L. Ed. at 91.

We followed the reasoning from *Ex Parte Wilson* that the right to be prosecuted by indictment for an "infamous crime" under the Fifth Amendment applied the concept of "infamous punishment," not the particular type or character of the crime. *See Flannagan*, 177 Iowa at 401, 158 N.W. at 643–44. Quoting *Wilson*, we said, " 'For more than a century, imprisonment at hard labor in the . . . penitentiary . . . has been considered an infamous punishment in England and America.' " *Id.* at 400, 158 N.W. at 643 (quoting *Ex parte Wilson*, 114 U.S. at 428, 5 S. Ct. at 940, 29 L. Ed. at 93). Thus, we held in *Flannagan* that a person sentenced to a year of hard labor in the penitentiary was entitled to due process protections. *Id.* at 401–02, 158 N.W. at 644. Nevertheless, we made no effort to define an "infamous crime" under the Iowa Constitution for purposes of disqualifying persons from voting. We also did not decide if the punishment concept or the character-of-the-crime concept applied to the context of voting.

A few months after we decided *Flannagan*, we decided *Blodgett*. Unlike *Flannagan*, *Blodgett* did implicate article II, section 5 of our constitution and required us to decide if forgery (as defined in Iowa Code section 4853 (Supp. 1913)) was an infamous crime. *See Blodgett*, 177 Iowa at 578, 159 N.W. at 244. At the time, "the punishment prescribed by statute for forgery" was "confinement in the penitentiary not more than ten years." *Id.* Our unabridged reasoning regarding the definition of infamous crimes was: "Any crime punishable by imprisonment in the penitentiary is an infamous crime." *Id.* (citing *Flannagan*, 177 Iowa at

400, 158 N. W. at 643). However, we provided no other analysis in explaining our decision. *See id.*

Our jurisprudence on infamous crimes following *Blodgett* sat dormant until 1957, when we decided *Haubrich.* In *Haubrich,* the defendant had been convicted of income tax evasion under federal law, and the rights the parties assumed he had lost as a result of that conviction had been restored by the governor. 248 Iowa at 979–80, 83 N.W.2d at 452. The case turned on two questions: whether a person loses citizenship upon a federal conviction for what would constitute an infamous crime if convicted under state law and whether the Governor of Iowa has the power to restore such a person's rights under Iowa law, even if there has been no presidential pardon. *See id.* at 982–87, 83 N.W.2d at 453–56. Identifying the constitutional context of the case, however, we reiterated the concept articulated in *Blodgett* and *Flannagan* that an infamous crime was punishable by imprisonment in the penitentiary. *See id.* at 980, 83 N.W.2d at 452. Thus, we did not undertake to define "infamous crime," but only addressed the process and consequences that follow after a person is convicted of an "infamous crime." We merely followed the path first taken forty-one years before and made no independent analysis.

This background reveals that we have never engaged in a textual analysis of the meaning of "infamous crime" in article II, section 5. Our trilogy of cases never examined the specific language of article II, section 5 and its surrounding context. We feel obligated to conduct this analysis before relying on those cases to resolve this case.

In examining the text of article II, section 5, we observe that the language used by our founders limits disenfranchisement to persons "convicted of any infamous crime." Iowa Const. art. II, § 5. Under our

constitutional interpretation framework, we first look to the words used by our framers to ascertain intent and the meaning of our constitution and to the common understanding of those words. *Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004). We recognize, of course, that "words at best are mere messengers of the thoughts and ideas they are sent to convey." *Rudd v. Ray*, 248 N.W.2d 125, 129 (Iowa 1976). Yet, the specific constitutional language at issue speaks of a conviction of a crime, not punishment for a crime. Moreover, our founders knew the difference between the concepts of conviction and punishment. In prohibiting slavery and involuntary servitude under our constitution, our founders prohibited involuntary servitude "unless for the punishment of crime." Iowa Const. art. I, § 23. Thus, between the two concepts of infamy discussed in *Ex parte Wilson*—conviction of a crime or punishment for a crime—the use of the word "convicted" in the infamous crime clause reveals our founders intended the concept of "infamous crime," in the context of voter disqualification, to be aligned with the concept of conviction, not punishment. There is simply no textual support for using punishment to define an "infamous crime."

It is also instructive that the obvious purpose of article II, section 5 was to declare those classes of persons who would be disqualified to vote. We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances. *Redmond v. Ray*, 268 N.W.2d 849, 853 (Iowa 1978). It is reasonable to conclude our founders intended to adopt the concept of infamy specifically applicable to the disqualification of persons from participating in various aspects of the democratic process, not the concept of infamy applicable to punishment and procedural rights in criminal prosecutions. In the context of the limitation of political and

civil rights, infamous described the nature of the crime itself, irrespective of punishment. *See Snyder v. King*, 958 N.E.2d 764, 773–76 (Ind. 2011) (reviewing the historical backdrop of its infamous crimes clause and concluding "[h]istory thus demonstrates that whether a crime is infamous . . . depends . . . on the nature of the crime itself").

It is also important to observe that the previous binary nature of punishment in Iowa has given way to a more complex and nuanced continuum of punishment. At the time of our constitutional convention, only two classifications of crimes existed—felonies and misdemeanors. Felons were sent to prison; misdemeanants were sent to jail. *See* Iowa Code § 2816 (1851) ("Public offenses are divided into felonies and misdemeanors."); *id.* § 2817 ("A felony is an offense punishable with death, or by imprisonment in the penitentiary of this state."); *id.* § 2818 ("Every other criminal offense is a misdemeanor."). Aggravated misdemeanors did not exist in 1857 when our current constitution was drafted, *see id.* §§ 2816–18, nor did they exist in 1916 when we decided *Blodgett* and *Flannagan, see* Iowa Code §§ 8533–36, 8538 (1919); *see also Bopp v. Clark,* 165 Iowa 697, 701, 147 N.W. 172, 174 (1914). The drafters of our constitution easily could have chosen to disqualify those convicted of crimes "punishable by imprisonment in the penitentiary"; the drafters of Oregon's constitution certainly did. *See* Oregon Const. art. II, § 3 ("The privilege of an elector, *upon conviction of any crime which is punishable by imprisonment in the penitentiary*, shall be forfeited, unless otherwise provided by law." (Emphasis added.)). But, our drafters did not.

We conclude *Blodgett* was clearly erroneous and now overrule it. We also disapprove of any suggestion in *Flannagan* or *Haubrich* that the mere fact that a crime is punishable by confinement in a penitentiary

disqualifies the offender from exercising the privilege of an elector. Consequently, Chiodo's position quickly unravels from the threads of the three cases from which it was spun. Yet, we must still decide the underlying question whether the crime of OWI, second offense, is an infamous crime. Our constitution is supreme, Iowa Const. art. XII, § 1, and if OWI, second offense, is an infamous crime, Bisignano is disqualified from office under our constitution.

We begin our search for the meaning of the phrase "infamous crime" by observing that our legislature defined "infamous crime" in 1994 to mean "a felony as defined in section 701.7 or an offense classified as a felony under federal law." *See* 1994 Iowa Acts ch. 1180, § 1 (codified at Iowa Code § 39.3(8) (1995)). While the legislature may help provide meaning to the constitution by defining undefined words and phrases, the definition provided by our legislature itself must be constitutional. *See Junkins v. Branstad,* 421 N.W.2d 130, 134–35 (Iowa 1988) (noting the importance of a legislative definition of "appropriation bill," but recognizing "it does not settle the constitutional question"); *cf. Powell v. McCormack,* 395 U.S. 486, 549, 89 S. Ct. 1944, 1978, 23 L. Ed. 2d 491, 532 (1969) ("Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch."). The legislature may not add to or subtract from the voter qualifications under the constitution. *See Coggeshall v. City of Des Moines,* 138 Iowa 730, 737, 117 N.W. 309, 311 (1908). In the end, it is for the courts to interpret the constitution. *See Varnum,* 763 N.W.2d at 875. This important principle has, more than any other, helped allow our democracy to advance with each passing generation with our constitutional beliefs intact.

The felony–misdemeanor distinction does offer a clean bright-line rule. The benefits of such a rule are obvious, and the allure is tempting. Yet, our role is to interpret our constitution by using the language found in the constitution. We perform this role with the presumption that the drafters of our constitution were careful and thoughtful in selecting each word to convey the meaning they intended would be carried forward. If the words of the constitution do not support a bright-line rule, neither can we. Additionally, we recognize that we are dealing with a constitutional provision that disqualifies persons from voting. Ease of application does not justify a rule that disenfranchises otherwise eligible voters.[2]

A review of article II of our constitution reveals the framers clearly understood that an "infamous crime" and a "felony" had different meanings. Most immediately, article II disqualifies an elector once convicted of an infamous crime. Iowa Const. art. II, § 5. Yet, in the same article, electors "in all cases except treason, *felony*, or breach of the peace" are privileged from being arrested "on the days of election, during their attendance at such election, [and] going to and returning therefrom." *Id.* art. II, § 2 (emphasis added). If the drafters intended the

---

[2]The real and substantial political equality we enjoy, and to which we all endeavor, owes in no small part to the universal suffrage among adult citizens. Denying the right to vote is a privation of our highest ideals as a society:

> Denying the right to vote to people who are living and working in the community runs counter to the modern ideal of universal suffrage. Under that ideal, each citizen is entitled to cast one vote, and each vote counts the same regardless of who casts it. Voting thus becomes a powerful symbol of political equality; full citizenship and full equality mean having the right to vote.

Erika Wood, Brennan Center for Justice, *Restoring the Right to Vote* 4 (2009), *available at* http://www.BrennanCenter.org/Publication/Restoring-Right-Vote+ (last visited Apr. 15, 2014).

two concepts to be coextensive, different words would not have been used. This reading is bolstered by article III, section 11, which privileges members of the legislature from arrest during the session of the general assembly, or going to and returning from session "in all cases, except treason, *felony,* or breach of the peace." *Id.* art. III, § 11 (emphasis added). Our framers knew the meaning of felony and knew how to use the term. *See In re Johnson,* 257 N.W.2d 47, 50 (Iowa 1977) ("It is our duty, if fairly possible, to harmonize constitutional provisions."). As with our reasoning dispensing with the infamous-punishment test, if our founders intended the infamous crimes clause to mean all felony crimes, we must presume they would have used the word "felony" instead of the phrase "infamous crime." *Cf. Snyder,* 958 N.E.2d at 771 ("[I]f the framers had intended the Infamous Crimes Clause to apply only to felonies, we presume they would have used the term 'felony' instead of 'infamous crime.' "). Accordingly, the legislature's decision to define an "infamous crime" as a "felony" cannot stand alone to define the constitutional meaning of "infamous crime" because the two terms unquestionably have different meanings.

This analysis does not mean the legislative definition of "infamous crime" is not helpful in deciding the definition under article II, section 5. *Cf. State v. Bruegger,* 773 N.W.2d 862, 873 (Iowa 2009) ("Legislative judgments are generally regarded as the most reliable objective indicators of community standards . . . ."). In fact, given the long-standing awareness of the possible interplay between aggravated misdemeanors and our holding in *Blodgett* that crimes punishable by confinement in a penitentiary are "infamous crimes," Iowa Code section 39.3(8) (2013) may represent an evolution in our shared understanding of the gravity of crimes that should subject an offender to

disenfranchisement.  *Cf. Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630, 642 (1958) (looking to "the evolving standards of decency that mark the progress of a maturing society"); *Ex parte Wilson*, 114 U.S. at 427, 5 S. Ct. at 940, 29 L. Ed. at 93 ("What punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another.").  Thus, we acknowledge the legislative definition as a factor and turn to consider the meaning of the phrase "infamous crime" under article II, section 5.

The meaning of the word "infamous" in the mid-nineteenth century was " 'most vile; base; detestable.' "  *Snyder*, 958 N.E.2d at 780 (quoting Noah Webster, *A Dictionary of the English Language* 202 (rev. ed. 1850)). It captures a concept dating back more than 2000 years to ancient Greece, when "criminals who had committed certain heinous crimes were pronounced 'infamous' and thereafter 'prohibited from appearing in court, voting, making speeches, attending assemblies, and serving in the army' and thus prohibited from influencing public affairs."  *Id.* at 773 (quoting Walter Matthews Grant, et al., *Special Project: The Collateral Consequences of a Criminal Conviction*, 23 Vand. L. Rev. 929, 941 (1970)).

In 1839, the territorial legislature adopted a statute that declared certain persons to be "infamous."  Additionally, the statute specifically applied to voting.  It stated:

> Each and every person in this Territory who may hereafter be convicted of the crime of rape, kidnapping, wilful [sic] and corrupt perjury, arson, burglary, robbery, sodomy, or the crime against nature, larceny, forgery, counterfeiting, or bigamy, shall be deemed infamous, and shall forever thereafter be rendered incapable of holding any office of honor, trust, or profit, of voting at any election, of serving as a juror, and of giving testimony in this Territory.

The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182 (1839). The 1839 statute provides us with a limited window into some specific understanding of the meaning of "infamous crime[s]" of the day.

Of course, like Iowa Code section 39.3(8) (2013) today,[3] this statute is not a constitutional test. *See Snyder*, 958 N.E.2d at 780 (concluding an 1843 Indiana statute enumerating nine infamous crimes was not a present-day constitutional test); *see also Green v. City of Cascade*, 231 N.W.2d 882, 890 (Iowa 1975) (recognizing that while we give "respectful consideration to the legislature's understanding of constitutional language," we are the final arbiter of the meaning of the Iowa Constitution). Moreover, the judgment captured by the statute in 1839 preceded our constitutional convention by nearly a generation, and it was repealed before 1851.

More directly, it appears the drafters at our 1857 constitutional convention intended to deprive the legislature of the power to define infamous crimes. The proposed 1844 Iowa Constitution had contained a provision denying the privileges of an elector to "persons declared infamous *by act of the legislature.*" Iowa Const. art. III, § 5 (1844) (emphasis added). This language was removed in the 1846 Iowa Constitution. *See* Iowa Const. art. III, § 5 (1846) ("No idiot, or insane

---

[3]We recognize article II, section 5 was amended by Iowa voters in 2008. However, there is a reason none of the parties argued the amendment gave new meaning to the infamous crimes clause. Without any question, the amendment was technical and intended only to update descriptions of mentally incompetent persons we no longer use. There was no intention to update the substantive meaning of the infamous crimes clause, and the companion judicial interpretations accordingly continued in force unaffected by the amendment. In short, the amendment did nothing but what it was intended to do: replace offensive descriptions of people with new descriptions. Thus, we properly refrain from considering the amendment in our analysis.

person, or persons convicted of any infamous crime, shall be entitled to the privileges of an elector."). While the 1846 constitution was modeled on the 1844 constitution, historical commentary regarding 1846 convention reveals radically egalitarian and inclusive voices influenced the debate over our incipient fundamental law: "[A] strong effort [was] made to extend this political right to resident foreigners who had declared their intention of becoming citizens." Benjamin F. Shambaugh, *History of the Constitutions of Iowa* 301 (1902). This suggests its infamous crimes clause was meant to apply narrowly.

The drafters at the 1857 constitutional convention did not reinsert the 1844 language. Certainly, the drafters at our 1857 constitutional convention knew how to delegate authority over elections to the legislature. Indeed, the Indiana constitutional conventions of 1816 and 1850 gave its general assembly authority to define infamous crimes. *Snyder*, 958 N.E.2d at 774–75; *see also* Indiana Const. art. II, § 8 ("The General Assembly shall have power to deprive of the right of suffrage, and to render ineligible, any person convicted of an infamous crime."). Our founders were aware of the 1851 Indiana Constitution, but clearly did not choose to adopt its language for article II, section 5.

As recognized by other courts, infamous crimes clauses found in many state constitutional voting provisions are properly understood as a regulatory measure, not a punitive measure. *See Snyder*, 958 N.E.2d at 781. Article II of the Iowa Constitution appears compatible with this approach. Our framers devoted the entire article to voting. Article II establishes the requirements to exercise the right to vote, Iowa Const. art. II, § 1; provides safeguards to the exercise of the right to vote, *id.* art. II, §§ 2–3; and lists two classes of individuals not granted the right to vote, *id.* art. II, § 5. The overall approach reveals our framers not only

understood the importance for Iowans to have a voice in our democracy through voting, but they further understood the fundamental need to preserve the integrity of the process of voting by making sure it was not compromised by voices that were incompetent to meaningfully participate or voices infected by an infamous disposition. *See Snyder*, 958 N.E.2d at 781 ("The most common regulatory justification for criminal disenfranchisement provisions is that they preserve the integrity of elections.").

Within this context and setting, the concept of disenfranchisement was not meant to punish certain criminal offenders or persons adjudged incompetent, but to protect " 'the purity of the ballot box.' " *Id.* (quoting *Washington v. State*, 75 Ala. 582, 585 (1884)); *see also Otsuka v. Hite*, 414 P.2d 412, 417 (Cal. 1966) (adopting the justification), *abrogated on other grounds by Ramirez v. Brown*, 507 P.2d 1345, 1353 (Cal. 1973) (en banc), *judgment rev'd by Richardson v. Ramirez*, 418 U.S. 24, 56, 94 S. Ct. 2655, 2672, 41 L. Ed. 2d 551, 572 (1974). Our drafters wanted the voting process in Iowa to be meaningful so that the voice of voters would have effective meaning. Thus, disenfranchisement of infamous criminals parallels disenfranchisement of incompetent persons under article II, section 5. The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots. As a result, the regulatory focus of disenfranchisement under article II reveals the meaning of an "infamous crime" under article II, section 5 looks not only to the classification of the crime itself, but how a voter's conviction of that crime might compromise the integrity of our process of democratic governance through the ballot box. *See Redmond*, 268 N.W.2d at 863.

Any definition of the phrase "infamous crime" has vast implications and is not easy to articulate. However, we have said regulatory measures abridging the right to vote "must be carefully and meticulously scrutinized." *Devine*, 268 N.W.2d at 623. Similarly, the Supreme Court has said measures limiting the franchise must be " 'necessary to promote a compelling governmental interest.' " *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S. Ct. 995, 1003, 31 L. Ed. 2d 274, 884 (1972) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S. Ct. 1322, 1331, 22 L. Ed. 2d 600, 615 (1969)). This context helps frame both the governmental interest at stake in protecting the integrity of the electoral process and the individual's vital interest in participating meaningfully in their government. The definition of "infamous crime" turns on the relationship particular crimes bear to this compelling interest.

Some courts have settled on a standard that defines an "infamous crime" as an "affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections." *Snyder,* 958 N.E.2d at 782; *see also Otsuka,* 414 P.2d at 422 ("[T]he inquiry must focus more precisely on the nature of the crime itself, and determine whether the elements of the crime are such that he who has committed it may reasonably be deemed to constitute a threat to the integrity of the elective process."). Other courts limit the definition to a "felony, a *crimen falsi* offense, or a like offense involving the charge of falsehood that affects the public administration of justice." *Commonwealth ex rel. Baldwin v. Richard,* 751 A.2d 647, 653 (Pa. 2000). Still other courts establish the standard at crimes marked by "great moral turpitude." *Washington,* 75 Ala. at 585.

Considering the crime at the center of this case, we need not conclusively articulate a precise definition of "infamous crime" at this time. We only conclude that the crime must be classified as particularly serious, and it must be a crime that reveals that voters who commit the crime would tend to undermine the process of democratic governance through elections. We can decide this case by using the first part of this nascent definition.

Throughout our history, we have separated the seriousness of crimes by felony and misdemeanor designations. Crimes classified as felonies are serious offenses, and misdemeanors are less serious. Within this framework, "infamous crime[s]," in light of its meaning throughout history, would *at most* extend to the area of serious crimes occupied by felonies. The concept of infamous crime is inconsistent with the concept of misdemeanor crime. It conveys a societal judgment not present in a misdemeanor, especially as it relates to the concept of disenfranchisement. Even if a misdemeanor crime could theoretically include a crime with a nexus to the voting process, *see, e.g.*, Iowa Code § 39A.3 (describing election misconduct in the second degree and making it an aggravated misdemeanor), the nexus would be too tenuous to support disenfranchisement if considered only a misdemeanor. Thus, an infamous crime first must be a crime classified as a felony. As a misdemeanor crime, OWI, second offense, is not an "infamous crime" under article II, section 5.

It will be prudent for us to develop a more precise test that distinguishes between felony crimes and infamous crimes within the regulatory purposes of article II, section 5 when the facts of the case provide us with the ability and perspective to better understand the needed contours of the test. This case does not. OWI, second offense, is

a crime that has never been considered by our legislature to be an infamous crime. It is not aligned in any way with those crimes designated by the legislature in 1839 as infamous. It is viewed by our legislature as a misdemeanor crime.[4] It is a crime that does not require specific criminal intent and lacks a nexus to preserving the integrity of the election process.

Our conclusion that OWI, second offense, is not an infamous crime does not minimize its seriousness, or the seriousness of any other misdemeanor, but recognizes our framers sought only to limit the types of crimes that should disqualify a person from voting, and that limit was drawn at "infamous crime[s]." A crime that was not serious enough to be a felony *a fortiori* was not intended by our founding drafters to be an "infamous crime."

Our decision today is limited. It does not render the legislative definition of an "infamous crime" under Iowa Code section 39.3(8) unconstitutional. We only hold OWI, second offense, is not an "infamous crime" under article II, section 5, and leave it for future cases to decide which felonies might fall within the meaning of "infamous crime[s]" that disqualify Iowans from voting.

### IV. Conclusion.

We consider and reject all other claims and arguments asserted by Chiodo. The crime of OWI, second offense, is not an infamous crime under article II, section 5 of the Iowa Constitution. The decision of the

---

[4]Although an aggravated misdemeanor, it offers a special minimum sentence of local imprisonment of seven days, Iowa Code § 321J.2(4)(*a*), making it even less serious than other aggravated misdemeanors. *Cf. id.* § 903.1(2) (providing a maximum term of imprisonment for aggravated misdemeanors when "a specific penalty is not provided").

district court is affirmed. Anthony Bisignano's name may appear on the ballot.

**AFFIRMED.**

All justices concur except Mansfield and Waterman, JJ., who concur specially; Wiggins, J., who dissents; and Appel, J., who takes no part.

**MANSFIELD, J. (specially concurring).**

While I agree that Anthony Bisignano should not be disqualified from running for state senate, I cannot join the plurality opinion. I agree with the Panel, the district court, and Iowa's elected representatives that felonies and only felonies are "infamous crimes" under article II, section 5 of the Iowa Constitution.

As the dissent correctly points out, the plurality throws out nearly a hundred years of this court's precedents. Yet what is its replacement? That is hard to tell. Lacking a sound conceptual floor for its opinion, or a clear test, I think the plurality has unnecessarily introduced uncertainty and invited future litigation over voting rights. For example, I anticipate we will now see right-to-vote lawsuits from current prison inmates.

The plurality's assertion that its decision is "limited" does not make it so. Let's review the plurality's standards, which it admits are "nascent." The plurality says that only felonies falling within "the regulatory purposes of article II, section 5" disqualify a person from voting. The plurality also says that only "particularly serious" crimes that "tend to undermine the process of democratic governance through elections" disqualify a person from voting. The plurality adds, "The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots."[5]

---

[5]The plurality sows additional confusion by citing *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S. Ct. 995, 1003, 31 L. Ed. 2d 274, 284 (1972), and suggesting that a "compelling governmental interest" must support any disenfranchisement of a voter convicted of a crime. The plurality ignores the fact that two years after *Dunn*, the United States Supreme Court rejected the view that felon disenfranchisement must be supported by a compelling state interest, noting that the Fourteenth Amendment expressly contemplates the disenfranchisement of voters convicted of a crime. *See*

I think most people would agree these unrefined standards basically offer no guidance at all, therefore leaving the door wide open for future litigation. Notably, Iowa's constitution, and the plurality opinion make no distinction between convicted felons who are presently incarcerated and those who have served their time. Thus, under the plurality's approach, even a person who is presently serving a lifetime-without-parole-sentence can argue that he or she should be able to vote from prison because barring him or her from voting would "undermine the process of democratic governance through elections." When we overrule precedent that established a definite rule, we owe the public more than a welcome mat for future lawsuits.

The plurality's approach to whether a crime is "infamous" is an odd mix of half-hearted originalism and excessive fealty to a court decision from Indiana. Initially, the plurality draws on mid-nineteenth century sources to ascertain the meaning of "infamous." According to this review, "infamous crime" does not mean "felony" nor is it based on the punishment for the crime. Rather, it is based on how bad the crime is. Thus, "infamous" seems to mean something like "heinous" according to this part of the plurality opinion. Accordingly, the plurality quotes an 1839 Iowa territorial law listing infamous crimes that disqualify a person from voting. The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182 (1839). Actually, this list

---

*Richardson v. Ramirez*, 418 U.S. 24, 54–55, 94 S. Ct. 2655, 2670–71, 41 L. Ed. 2d 551, 570–71 (1974); *see also Madison v. State*, 163 P.3d 757, 767–68 (Wash. 2007) (reviewing the caselaw that holds the right to vote is not fundamental for convicted felons).

appears to include most felonies.[6] I would argue that this list, if anything, supports either of two viewpoints: (1) "infamous crime" was up to the legislature to define, or (2) "infamous crime" meant felony.

The plurality then shifts gears and moves on to out-of-state precedent, primarily a 2011 decision of the Indiana Supreme Court. *See Snyder v. King*, 958 N.E.2d 764 (Ind. 2011). That decision interpreted article II, section 8 of the Indiana Constitution, which provides, " 'The General Assembly shall have the power to deprive the right of suffrage, and to render ineligible, any person convicted of an infamous crime.' " *Id.* at 768 & n.1 (quoting Ind. Const. art. II, § 8). In its opinion, the Indiana court, like the plurality here, began with a review of historical sources. *Id.* at 773–80.

However, toward the end of its opinion the Indiana Supreme Court largely turned away from historical analysis. Instead, it decided that article II, section 8 of the Indiana Constitution serves only a "regulatory" purpose and that it can apply only to crimes like "treason, perjury, malicious prosecution, and election fraud," where the person who committed the crime "may be presumed to pose a bona fide risk to the integrity of elections." *Id.* at 781–82. In justifying this rather stark change in direction, the court relied on another clause of the Indiana Constitution as well as the placement of article II, section 8 within article II. *Id.* at 781. As the court explained,

> [T]he Infamous Crimes Clause was *not* intended to be used primarily as a retributive or deterrent mechanism of punishment. It is a cardinal principle of constitutional interpretation that our Constitution should be interpreted as

---

[6]Murder is not in the list, but at that time murder was punishable by death, which made voting rights a moot point. *See* The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, First Div., § 2, at 150.

a whole. Article I, § 18, of the Constitution provides that "[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. I, § 18. Interpreting the Infamous Crimes Clause as authorizing the General Assembly to use a particular punishment solely for the purpose of exacting vindictive justice would conflict with this provision of the Indiana Bill of Rights. And we will avoid reading such a conflict into the Constitution unless the document itself clearly requires us to do so.

We think instead that the Infamous Crimes Clause is properly understood primarily as a regulatory measure. While history clearly demonstrates its punitive characteristics, its primarily regulatory character is clearly demonstrated by its placement in Article II, which seeks to regulate suffrage and elections, and the justification underlying criminal disenfranchisement provisions generally.

*Id.* (citation omitted).

My colleagues here largely track *Snyder* but back off from fully embracing it. Thus, the plurality does not reach *Snyder*'s ultimate conclusion that violent serious felonies like murder and kidnapping cannot disqualify a person from voting. But the plurality's quasi-*Snyder* jurisprudence has multiple problems as applied to Iowa.

First, Iowa's situation is different from Indiana's. Among other things, Iowa does *not* have a constitutional provision requiring that punishment be "founded on the principles of reformation." Ind. Const. art. I, § 18. Also, as I discuss below, Iowa amended and reenacted its constitutional clause disenfranchising persons convicted of infamous crimes in 2008. Importing an Indiana decision into Iowa is flawed on this ground alone.

In addition, I think some of *Snyder*'s premises are questionable. For example, I do not place much stock in the "placement" of article II, section 8 within the Indiana Constitution. Nor do I place much stock in the placement of article II, section 5 within the Iowa Constitution. These are the parts of those constitutions that *relate to voting*. Where else

would you include a clause that authorizes denial of the vote to persons convicted of crimes? So I think it is a stretch to say that because these provisions appear in their respective constitutions under "suffrage," we have to interpret them narrowly.

Third, *Snyder* at least deals with the question of whether people in prison can vote even if their crime is not infamous. Thus, *Snyder* concludes that the state can use its "police power" to deny a convicted person the right to vote during the term of imprisonment regardless of the crime committed. *Snyder*, 958 N.E.2d at 784–85. But *Snyder* cites no textual basis for this conclusion in the Indiana Constitution. *Id.* Instead, *Snyder* relies on out-of-state cases, national "consensus," and the historical practice in Indiana. *Id.* Regardless of the merits of *Snyder*'s reasoning, the opinion at least has the virtue of clarifying that current inmates will not be able to vote. The plurality opinion here leaves that highly important question unanswered.

Finally, whatever its flaws, *Snyder* does establish a somewhat clear rule of law. Current prisoners cannot vote, whereas released prisoners can vote unless their crime was akin to "treason, perjury, malicious prosecution, and election fraud." *Id.* at 782, 785. My colleagues' opinion, by going only partway on *Snyder*, does not pass that clarity threshold and instead fosters uncertainty.

I would grant that the plurality has done a good job of saying what the legal standard for disqualification *isn't*. It is not conviction of a felony, conviction of a misdemeanor, or conviction of a crime with the potential for incarceration in a penitentiary. However, other than the indeterminate language I've quoted above, the plurality offers no further guidance as to what the standard *is*. As I have already argued, this

standard is essentially no standard at all and will lead to more voting and ballot cases as we sort out the implications of today's ruling.

Having voiced my criticisms of the plurality, let me now explain how I would decide this case. As I discuss below, I think there are ample grounds for holding that our constitution, in its current form, disqualifies felons and only felons from voting and holding public office.

Our constitution gives the right to vote to all citizens, Iowa Const. art. II, § 1, subject to the following exception: "[A] person convicted of any infamous crime shall not be entitled to the privilege of an elector." *Id.* art. II, § 5. Although article II, section 5 was amended and reenacted by the general assembly and the people of Iowa a few years ago, the prohibition on voting by persons convicted of infamous crimes dates back to our original constitutional history. Thus, our 1857 constitution contained this language, which it borrowed essentially verbatim from the 1846 constitution. *Compare* Iowa Const. art. II, § 5 (1857), *with* Iowa Const. art. II, § 5 (1846).

I agree with the plurality on two points it makes about the text of article II, section 5. First, "infamous" is rather vague language. It does not cry out with specificity. Second, our framers' use of the word "infamous" and especially the phrase "infamous crime" suggest that our interpretive focus should be on the category of *crime*, not the type of *punishment*.

However, I think some additional lessons can be extracted from our early constitutional history. I have already mentioned the 1839 territorial legislation that more or less equates "infamous crime" for purposes of denying voting privileges with felony. *See* The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182; *see also Homan v. Branstad,* 812 N.W.2d 623, 629 (Iowa

2012) (indicating that in construing a provision of the Iowa Constitution, "our mission ' "is to ascertain the intent of the framers" ' " (quoting *Rants v. Vilsack,* 684 N.W.2d 193, 199 (Iowa 2004))). Hence, I remain unpersuaded that "infamous crime" as used in article II, section 5 could not mean the same thing as felony, at least if the legislature made that choice. The plurality reaches its conclusion based exclusively on the following syllogism:

> (1) Article II, section 2 of the Iowa Constitution provides that electors "shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest on the days of election" and article III, section 11 provides that senators and representative "in all cases, except treason, felony, or breach of the peace, shall be privileged from arrest during the session of the General Assembly."

> (2) Because the word "felony" is used in these other provisions of our constitution, and "infamous crime" is used in article II, section 5, infamous crime cannot mean the same thing as felony.

This strikes me as a relatively weak argument. The obvious point it ignores is that the language in article II, section 2 and article III, section 11 is a direct borrowing from Article I, Section 6 of the United States Constitution.[7] Given the specific source of these two provisions, I do not think we can use them as a lexicon for interpreting the rest of the Iowa Constitution. And by the way, does this mean that treason is not a felony?

---

[7]Article I, Section 6 of the United States Constitution states,

> The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same . . . .

U.S. Const. art. I, § 6.

As noted by my colleagues, there has been considerable water under the bridge since 1857. In 1916, we declared that any crime punishable by imprisonment in the penitentiary was an infamous crime for purposes of article II, section 5. *See Blodgett v. Clarke*, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam). We reiterated that interpretation in 1957. *See State ex rel. Dean v. Haubrich*, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957). However, when those cases were decided, "felony" and "crime punishable by imprisonment in the penitentiary" were synonymous. *See* Iowa Code §§ 5093–5094 (1897); *id.* §§ 687.2, .4 (1954). There was no such thing as an aggravated misdemeanor punishable by imprisonment in the penitentiary. Thus, like the Panel and the district court, I do not regard those precedents as controlling on whether a nonfelony that was potentially punishable by imprisonment in the penitentiary would disqualify a person from voting. Those cases do effectively hold that felons cannot vote or hold elective office under the Iowa Constitution. And for that proposition, I think they remain good law.

Furthermore, in 1994, the legislature enacted the current law that specifically defines "infamous crime" for voting and elective office purposes to mean a felony. *See* 1994 Iowa Acts ch. 1180, § 1 (codified at Iowa Code § 39.3(8) (1995)). This takes on particular significance, in my view, because our general assembly, in 2006 and 2007, and the voters of our state, in 2008, repealed the existing article II, section 5 and approved a new version. *See* 2006 Iowa Acts ch. 1188, § 1; 2007 Iowa Acts ch. 223, § 1.

The previous version of article II, section 5, dating back to 1857, read, "No idiot, or insane person, or person convicted of any infamous crime, shall be entitled to the privilege of an elector." Iowa Const. art. II,

§ 5 (1857). The new version reads, "A person adjudged mentally incompetent to vote or a person convicted of any infamous crime shall not be entitled to the privilege of an elector." Iowa Const. art. II, § 5 (amended 2008).

It is clear that the legislature's specific purpose in 2006 and 2007 was to remove offensive and outdated language from article II, section 5. However, the legislature knew it was keeping in place the prohibition on voting by those convicted of infamous crimes and knew that its own laws at that time defined infamous crime as a felony. *See* Iowa Code § 39.3(8) (2007). It would be absurd to suggest the legislature intended to approve a constitutional amendment that *struck down its own law*—Iowa Code section 39.3(8). Therefore, when the legislature twice voted to repeal and replace the existing article II, section 5 with a new version, I believe it ratified its own existing interpretation of that provision under which infamous crime meant a felony.

We have long adhered to this principle as it applies to statutory amendments. "When the legislature amends some parts of a statute following a recent interpretation, but leaves others intact, this 'may indicate approval of interpretations pertaining to the unchanged and unaffected parts of the law.' " *State v. Sanford*, 814 N.W.2d 611, 619 (Iowa 2012) (quoting 2B Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 49:10, at 144 (7th ed. 2008)); *see also Jenney v. Iowa Dist. Ct.*, 456 N.W.2d 921, 923 (Iowa 1990); *State ex rel. Iowa Dep't of Health v. Van Wyk*, 320 N.W.2d 599, 604 (Iowa 1982). Logic dictates that this rule should apply equally to constitutional amendments.

A decision of the Kansas Supreme Court illustrates this principle. *See In re Cent. Ill. Pub. Servs. Co.*, 78 P.3d 419 (Kan. 2003). In that case,

several companies that distributed and sold natural gas, but not in Kansas, argued they were entitled to a constitutional tax exemption for their inventory of gas stored in Kansas. *Id*. at 422. However, under a 1992 amendment to the relevant section of the Kansas Constitution, merchants' inventory for public utilities was denied an exemption. *Id*. at 424. Yet, Kansas law as of 1992 limited the statutory definition of "public utility" to companies that were engaged in transporting or distributing natural gas to, from, or within the state of Kansas, or that were engaged in storing natural gas in an underground formation in Kansas. *Id*. at 424–25. In concluding that this narrow statutory definition should apply, the court indicated among other things that the constitutional amendment should be construed consistently with "the statutes in existence at the time the . . . amendment was proposed and adopted." *Id*. at 426. Here too, where article II, section 5 was repealed and reenacted in 2006–2008, I believe the term "infamous crime" should be construed consistent with the statute in existence at that time, Iowa Code § 39.3(8). *See also Cal. Motor Express v. State Bd. of Equalization*, 283 P.2d 1063, 1065 (Cal. Ct. App. 1955) (finding that reenactment of a constitutional provision "which has a meaning well established by administrative construction is persuasive that the intent was to continue the same construction previously recognized and applied"); *Wakem v. Inhabitants of Town of Van Buren*, 15 A.2d 873, 875–76 (Me. 1940) ("It is a general rule that a reenactment, in substantially the same language, of a constitutional provision which had been previously construed and explained by the court, carries with it the same meaning previously attributed by the court to the earlier provision, in the absence of anything to indicate that a different meaning was intended."); *Bodie v. Pollock*, 195 N.W. 457, 458 (Neb. 1923) ("It is well settled in many, if not

most, of the jurisdictions of the country that, where a construction of constitutional provisions has been adopted and a constitutional convention thereafter re-enacts such provisions, it re-enacts not only the language of the provisions but the construction which has attached to the same.").

It was also no secret that Iowa law forbid voting by convicted felons when the proposed amendment went before the public at the 2008 general election. For example, a contemporary editorial in Iowa's largest newspaper said the following about the proposed revision of article II, section 5,

> It is worth thinking about whether an amendment belongs in the Constitution at all denying the vote to anyone based on diminished mental capacity, which is a relative thing. Also, in this section, the right to vote is denied to convicted felons, even those who have served their sentences, which is wrong. But those are questions for another day. For now, the language of the Iowa Constitution should be devoid of language that is seen as belittling.

*See* Editorial, *Change Harsh Wording in State Constitution*, Des Moines Register, October 31, 2008, at A14.

Personally, I agree with this editorial. I believe that convicted felons who have served their sentence and paid their debt to society ought to be able to vote, without requiring dispensation from the governor. By permanently disenfranchising convicted felons, Iowa puts itself in a small minority of three states. But my personal views do not carry weight when it comes to interpreting the Iowa Constitution.

Because the Iowa Constitution forbids convicted felons but not convicted misdemeanants from voting, I concur in the result in this case.

Waterman, J., joins this special concurrence.

#103/14–0553, *Chiodo v. The Section 43.24 Panel*

**WIGGINS, Justice (dissenting).**

I respectfully dissent. The plurality is rewriting nearly one hundred years of caselaw. I do not think we should do so at this time.

Our constitution sets the qualifications of electors as follows:

> Every citizen of the United States of the age of twenty-one years,[8] who shall have been a resident of this state for such period of time as shall be provided by law and of the county in which he claims his vote for such period of time as shall be provided by law, shall be entitled to vote at all elections which are now or hereafter may be authorized by law. The general assembly may provide by law for different periods of residence in order to vote for various officers or in order to vote in various elections. The required periods of residence shall not exceed six months in this state and sixty days in the county.

Iowa Const. art. II, § 1.

After giving certain persons the right to vote, the constitution disqualifies certain persons from voting. *Id.* art. II, § 5. It provides "a person convicted of any infamous crime shall not be entitled to the privilege of an elector." *Id.*

We have consistently defined "infamous crime" under our constitution as a crime for which the legislature fixed the maximum punishment as confinement in prison. *State ex rel. Dean v. Haubrich*, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957); *Blodgett v. Clarke*, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam); *Flannagan v. Jepson*, 177 Iowa 393, 400, 158 N.W. 641, 643 (1916). When the legislature adopted the legislative scheme to have three classes of misdemeanors in Iowa Code section 701.8, *see* 1976 Iowa Acts ch. 1245,

___

[8]Amendment XXVI to the United States Constitution lowered the voting age applicable to the states to eighteen years of age. U.S. Const. amend. XXVI.

§ 108 (codified at Iowa Code § 701.8 (1979)), it knew the constitutional definition of "infamous crime" was any crime for which the legislature fixed the maximum punishment as confinement in prison. Thus, by conscious choice, the legislature made an aggravated misdemeanor an infamous crime.

Eliminating our bright-line rule is not only unnecessary, but also dangerous. Now, we can no longer look to the crime's penalty to determine who can vote and who cannot vote. Rather, we now apply certain factors to make that determination. The plurality's approach does little to settle the law. I say this for a number of reasons.

First, I agree with the plurality that the legislature cannot write a constitutional definition of "infamous crime" by its enactment of Iowa Code section 39.3(8) (2013).[9] The legislature cannot disqualify a voter by defining "infamous crime" under our constitutional scheme because the constitution defines who is and who is not an eligible elector. *See Coggeshall v. City of Des Moines*, 138 Iowa 730, 744, 117 N.W. 309, 314 (1908) (invalidating an election where the City of Des Moines did not allow women to vote). However, the plurality implies section 39.3(8) is a factor we should consider to determine if a crime is an infamous crime and relies heavily upon this factor to reach its conclusion in this case. The plurality should not use the legislature's pronouncement in section 39.3(8) to control our constitutional duty to interpret the Iowa Constitution.[10]

---

[9]The legislature defines "infamous crime" as "a felony as defined in section 701.7, or an offense classified as a felony under federal law." Iowa Code § 39.3(8) (2013).

[10]It also can be argued the 2008 amendment amending article II, section 5 considered the legislature's definition of "infamous crime" when the amendment passed. However, I think it is doubtful because the crux of the 2008 amendment was to replace

Second, the factors enumerated by the plurality are so imprecise that a citizen of this state who has committed a crime has no idea as to whether he or she is eligible to vote. Under the plurality's factor analysis, some persons convicted of a felony may be able vote, while some persons convicted of a misdemeanor may not be able to vote. The plurality's factor analysis adds considerable uncertainty as to who can and who cannot vote. Is a person with a conviction for operating while intoxicated third, a felony, disqualified to vote? On the other end of the spectrum, is a person with a conviction for aggravated misdemeanor theft[11] disqualified to vote? This uncertainty will keep many qualified voters from the polls for fear of prosecution for voter fraud.

Finally, our election officials will have the same problems as our citizens in determining who can and cannot vote. This uncertainty will lead to greater election day problems and the casting of an inordinate

_____

the words "no idiot, or insane person" with "a person adjudged mentally incompetent." *Compare* Iowa Const. art. II, § 5 (1857), *with* Iowa Const. art. II, § 5 (amended 2008). I believe the explanation to the house joint resolution confirms my doubts. When the committee on state government introduced the proposed amendment the explanation provided in relevant part:

> This joint resolution proposes an amendment to the Constitution of the State of Iowa relating to persons who are disqualified from voting or holding elective office. The resolution removes the words "idiot" and "insane" from the constitutional provision and substitutes the phrase "mentally incompetent to vote."

H.J. Res. 5, 81st G.A., 2nd sess. (2006).

There is no indication in the official legislative history that the legislature considered the clause of article II, section 5 dealing with infamous crimes when it proposed the amendment. *See City of Cedar Rapids v. James Props., Inc.*, 701 N.W.2d 673, 677 (Iowa 2005) ("We give weight to explanations attached to bills as indications of legislative intent.").

[11]A person who steals property valued at $1000 commits an aggravated misdemeanor while a person who steals property valued at $1001 commits a felony. Iowa Code § 714.2(2)–(3).

amount of provisional ballots.  *See* Iowa Code § 49.81 (providing for the casting of provisional ballots).

For these reasons, I see no reason why at this time we should redefine the term "infamous crimes."  Today I fear we are abandoning a seaworthy vessel of precedent to swim into dangerous and uncharted waters.