STATE EX REL. SULLIVAN, Appellant, vs. DAMMANN, Secretary of State, Respondent.

*April 3—June 2, 1936.*

552

*John J. Sullivan* of Milwaukee, for the appellant:

For the respondent there was a brief by the *Attorney General* and *Leon E. Isaacson,* assistant attorney general, and oral argument by *Mr. Isaacson.*

NELSON, J. The sole question for decision is whether bill No. 56, S., Sess. 1933, became a law by virtue of the failure of the governor to return it with his objections to the house in which it originated within six days (Sundays excepted) after it was presented to him. A determination of that question requires a construction of sec. 10, art. V, of the constitution of this state. That section is as follows:

"Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large upon the journal and proceed to reconsider it. . . . If, after such reconsideration, two-thirds of the members present shall agree to pass the bill, . . . it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill . . . shall be entered on the journal of each house respectively. *If any bill shall not be returned by the governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law unless the legislature shall, by their adjournment, prevent its return, in which case it shall not be a law.*"

The language which particularly requires construction has been italicized. Clearly, the governor did not return the bill

with his objections to the senate, the house in which it originated, within six days (Sundays excepted), and the bill therefore became a law unless the legislature, by their adjournment on July 15, 1933, prevented its return. So the precise question which must be determined is whether the temporary adjournment of the legislature on July 15th, pursuant to Joint Resolution No. 136, S., was such an "adjournment" as prevented the return of the bill. So much of said resolution as need be considered is as follows:

"Resolved by the senate, the assembly concurring, That the legislature adjourn *sine die* at 11 a. m., on Tuesday, July 25, 1933. Be it further

"Resolved, That when the two houses of the legislature adjourn on this day, July 15, 1933, they adjourn until Saturday, July 22, 1933, at ten o'clock, a. m."

The resolution obviously provided for two different adjournments: (1) A *sine die* adjournment of the *legislature;* (2) a temporary adjournment of the two houses for more than three days.

The petitioner contends that the phrase, "unless the legislature shall, by their adjournment, prevent its return," relates only to a final or *sine die* adjournment of the legislature, and that the only adjournment which can prevent a return of a bill by the governor within six days is such an adjournment. The defendant contends that that phrase should be construed to apply to an adjournment of either house for less than three days, or to an adjournment of either house for more than three days with the consent of the other, as well as to a final or *sine die* adjournment of the legislature. So this controversy hinges upon the question whether the word "adjournment," found in sec. 10, art. V, means *sine die* adjournment of the legislature, or both a *sine die* adjournment of the legislature and a temporary adjournment of either or both of the houses. The word "adjournment" occurs only in sec. 10,

art. V, but the word "adjourn" occurs in secs. 7 and 10, art. IV. So much of sec. 7, art. IV, as is material, provides:

"And a majority of each [house] shall constitute a quorum to do business, but a smaller number may adjourn from day to day. . . ."

So much of sec. 10, art. IV, as is material, provides:

"Neither house shall, without consent of the other, adjourn for more than three days."

It is clear that the word "adjourn," as found in secs. 7 and 10, art. IV, relates to temporary adjournments of either or both houses, while the word "adjournment" mentioned in sec. 10, art. V, relates to the adjournment of the legislature.

A perusal of the proceedings of the convention which framed the constitution sheds no light upon the question here presented. No question seems to have arisen in the minds of the framers as to the meaning of the word "adjournment," as found in sec. 10, art. V, of the constitution of this state. That section is so like the phraseology of sec. 7 (second clause) art. I, of the constitution of the United States as to impel the conclusion that it was borrowed from that instrument and adopted by the framers without much, if any, discussion.

An examination of the joint rules of the senate and assembly, adopted by early legislatures, reveals no rule which in any sense might now be regarded as a practical construction of sec. 10, art. V. Apparently not until May 31, 1911, was the attorney general of this state called upon to render an opinion concerning a situation similar to the one here. On that day Levi H. Bancroft, attorney general, rendered an opinion to Governor McGovern to the effect: (1) That the governor had the right to return a bill with his objections at any time on the sixth day after it was presented to him, even though the legislature was not in session on that day, it hav-

ing theretofore temporarily adjourned pursuant to a joint resolution; and (2) that the clerk of the senate had authority to receive the bill and the governor's objections thereto, notwithstanding the fact that the legislature had temporarily adjourned or recessed. Biennial Reports and Opinions, 1912, p. 122.

In March, 1921, Governor Blaine returned Bill No. 55, S., Sess. 1921, to the senate with his objections. The question arose whether the bill had become a law by reason of his failure to return it within six days after it was presented to him. That bill was presented to the governor on March 5, 1921, at 4:35 in the afternoon. It remained with him until March 14, 1921, at 3:15 in the afternoon, when it was returned to the senate. On March 11th, pursuant to a joint resolution adopted by the senate and assembly, both houses adjourned or recessed until March 15th. Upon the request of the chairman of the judiciary committee of the senate, William J. Morgan, attorney general, rendered an opinion to the effect that the recess or adjournment of the two houses from March 11th to March 15th was not such an adjournment as prevented the return of the bill within the six days and that the bill had therefore become a law. X Op. Atty. Gen. 256. Mr. Morgan's opinion seems not to have settled the controversy so far as either the governor or the senate was concerned. Opinions by M. B. Olbrich, executive counsel, and by Harry Sauthoff, the governor's private secretary, were submitted, in which conclusions quite contrary to those of the attorney general were expressed. Those opinions were followed by a carefully considered opinion, signed by E. E. Brossard, assistant attorney general, and approved by Ralph M. Hoyt, deputy attorney general (X Op. Atty. Gen. 298). That opinion concurred in the conclusions expressed by Mr. Morgan, *supra*. Dr. Charles McCarthy, chief of the legislative reference library, was requested for information relative to the settled practice of returning vetoed bills to the

clerk or other officer of the house in which they originated during a recess of that house, and relative to the practice of delivering other executive messages and communications to the clerk or other officer of either house, in the event that such house was not in actual open session at the time the governor was ready to communicate with it. The report of Dr. McCarthy is on file in the office of the secretary of state, and so much of it as seems material is printed in the margin.[1]

[1] *"Senate.* It has been the practice for executive communications including veto messages to be delivered to the chief clerk of the senate or in his absence to his assistant. In case the chief clerk questioned the date of the return as being overdue, he has made a practice of entering a penciled marginal notation on the message of the exact time in the day and the date of return. This was only done in exceptional cases.

"The old formal method of waiting until the senate should come to order number 9 executive communications on its calendar has not been as fully followed as in earlier session(s). Under the more formal procedure followed in earlier years when the senate came to order number 9 on its calendar it would wait for messages from the executive. The secretary of the governor would be announced by the sergeant in the following manner, 'Mr. President, a message from the executive department.' The secretary of the governor would then state, 'Mr. President, I am directed by his excellency, the governor, to deliver to the senate a communication in writing.' The same practice was followed in receiving messages from the assembly.

"For the past eight years, at least, the procedure has been as follows: The executive communication is delivered to the chief clerk or to his assistant in case the senate is in recess. It is likewise delivered to the chief clerk when the senate is in session and read under order number 9 on the day's calendar. A record of the time when enrolled bills are delivered to the governor is kept in a book, especially for that purpose kept by the chief clerk's office. The governor's office likewise keeps a record of the date and exact time when bills are received. It has not been the practice in the past for the chief clerk to give dated receipts including the time of day on which the communication was received to the messenger bearing the communication from the executive office.

"Information secured from chief clerk of assembly, March 25, 1921.

"In regard to veto messages and executive communications from the governor, the practice for many years has been to put the message on the desk of the chief clerk. Upon the next calendar day, when the house reaches order of business number 11, the message is delivered by the chief clerk. Previous to this, the message was de-

On March 30, 1921, the senate transmitted the enrolled bill, veto message, and all opinions pertaining thereto, to the secretary of state. The secretary of state thereafter returned them to the senate. A motion to return the bill to the governor was lost, and the senate thereupon refused to pass the bill over the governor's veto.

No legislature, apparently, has adopted, or attempted to adopt, a rule as to the practice which it desired the governor, or his messenger, to pursue when returning a bill not approved by him to the house in which it originated, nor, so far as we are presently advised, has the legislature ever attempted to pass a law expressly authorizing the governor to return a bill to the house in which it originated when it was not in actual session, by delivering it to the clerk or other officer of that house.

It thus appears that there has been no such course of practical construction of the word "adjournment" as requires us to construe it as contended by defendant. Undoubtedly, at times, bills have been returned to the houses in which they originated, while actually in session, but that practice, assuming that it existed, does not unequivocally amount to a practical construction which lends support to defendant's contention that the word "adjournment" relates to a temporary adjournment of either house. The settled practice for at least twenty-five years seems clearly to have been to return a bill to the clerk of the house in which it originated. No objection to that procedure seems to have been made.

---

livered to the sergeant-at-arms by a special executive messenger. When the house reached order number 11, the sergeant then announced the receipt of the message and handed the message to the chief clerk. This is technically the correct way of handling these messages, but in practice the first method has prevailed for many years. There is no receipt given upon deliverance of the message to the clerk, nor is it dated in any way except with the date given it in the governor's office. The messages are then filed in the chief clerk's office and at the end of the session the messages are all given to the secretary of state's office for permanent filing."

It is our conclusion that the word "adjournment" means *sine die* adjournment of the legislature, and that such an adjournment is the only one that prevents the return of a bill. When a legislature adjourns *sine die,* it ceases to exist, and consequently has no further opportunity to exercise its constitutional right to reconsider a bill disapproved by the governor and to pass it over his veto. Its officers are no longer officers. Their tenure of office ends at the moment of adjournment. A bill returned by the governor to the legislature at a time when the latter has no further opportunity either to reconsider it, or to pass it over his veto, has not passed through all the possible and proper legislative stages in which, under the constitution, it may become a law. The framers of the constitution undoubtedly considered that a bill which was disapproved by the governor at a time when the legislature would have no opportunity to reconsider it or to pass it over his veto should not become a law. It is clear that the framers intended that the governor, to a certain extent, should participate in the enactment of laws, and that he should have the power temporarily at least to check the legislature in the enactment of laws so as to guard against the hasty enactment of illy-considered laws, or laws deemed by him to be unwise, unjust, or improvident. To that end, the constitution when first adopted gave the governor three days (Sundays excepted) in which to return a bill. That time was considered too brief for considerate action by the governor. Accordingly sec. 10, art. V, was amended by the people of this state in November, 1908. That history persuasively supports the conclusion that it is the will of the people of this state that the governor shall participate in the enactment of laws, and that he shall have a reasonable time in which to act considerately and intelligently. The governor is now given six days in which to return a bill. The legislature has no power to curtail or limit that time. It can, however, prevent the return of a bill by a *sine die* adjournment.

To construe sec. 10, art. V, as the defendant contends it should be construed, would at times give rise to unfortunate situations.  Were we to hold that a bill could be returned only to a house in actual session, the house in which the bill originated might inadvertently adjourn over the sixth day allowed the governor to return the bill and thereby prevent the governor from returning the bill to it.  The bill not being approved by the governor would, in that event, be dead and all the work connected with its passage by the legislature would be lost.  A construction which involves such possibilities should be avoided.  A construction which would require the governor, while considering a bill, to ascertain just what the house in which the bill originated is likely to do with respect to a temporary adjournment during the final days of the six-day period, and to act accordingly, would impose upon the governor added and wholly unnecessary burdens.

We perceive no cogent reason why the governor should not be permitted to return a bill to the house in which it originated by delivering it to its clerk or other responsible officer to be held by the latter until afforded an opportunity to present it to the house at its first session thereafter.

Our conclusions are in harmony with the holdings of the great majority of the state courts, although not in harmony with the conclusions reached by the supreme court of the United States.  Sec. 10, art. V, is practically identical with the corresponding provisions found in most of the constitutions of the several states and the constitution of the United States.

In the following cases the courts concluded that the word "adjournment," found in their respective constitutions, meant a final or *sine die* adjournment, and did not refer to or include a temporary recess or adjournment of the houses: *Miller v. Hurford,* 11 Neb. 377, 9 N. W. 477; *Opinion of Justices (Soldiers' Voting Bill),* 45 N. H. 607; *Hequembourg v. City of Dunkirk,* 49 Hun, 550, 2 N. Y. Supp. 447;

*Corwin v. Comptroller General,* 6 S. C. 390; *Johnson City v. Tennessee Eastern Electric Co.* 133 Tenn. 632, 182 S. W. 587; *State ex rel. Crenshaw v. Joseph,* 175 Ala. 579, 57 So. 942; *Herpending v. Haight,* 39 Cal. 189.

In the following cases it was held that a temporary recess or adjournment of a house, or of the houses constituting the legislature, does not prevent the return of a bill by the governor to the house in which it originated, but that such return may be made by delivering the bill, together with the objections, to some responsible officer of the house in which the bill originated: *Harpending v. Haight, supra; State ex rel. Putnam v. Holm,* 172 Minn. 162, 215 N. W. 200; *State ex rel. State Pharmaceutical Asso. v. Secretary of State,* 52 La. Ann. 936, 27 So. 565; *Soldiers' Voting Bill, supra; Johnson City v. Tennessee Eastern Electric Co., supra.* Compare, *Tuttle v. Boston,* 215 Mass. 57, 102 N. E. 350.

It is contended by the attorney general that since the decisions just hereinbefore cited all preceded the decision of the United States supreme court in *Okanogan Indians v. United States,* 279 U. S. 655, 49 Sup. Ct. 463, 64 A. L. R. 1434, generally referred to as the *Pocket Veto Case,* we should not follow them, but should adopt that construction which was given to a similar provision of the constitution of the United States by its highest court. We are unable to approve that contention. In the *Pocket Veto Case,* the court held that the word "adjournment," contained in the constitution of the United States, referred not only to a *sine die* adjournment of the congress, but also to an adjournment of its first session, and that consequently the President was prevented from returning a bill to the house in which it originated by the adjournment of the first session of the congress. The court held that the President could return a bill only to a house in actual session. In reaching that conclusion, the court apparently was strongly influenced by the long-established practice which had existed, by an opinion rendered by Attorney Gen-

eral Devens, in the early seventies, and by the fact that in 1868 the congress had unsuccessfully attempted to enact a law permitting the President to return a bill to the house in which the bill originated, when not in session, by delivering it to the secretary of the senate or to the clerk of the house. We may take judicial notice of the fact that prior to the adoption of the twentieth article of the amendments to the constitution of the United States, the congress convened on the first Monday of December and remained in continuous session until the adjournment of its first session, with the exception of the so-called Christmas recess, and that the second session likewise convened on the first Monday of December and continued in continuous session until the fourth day of March, with the exception of the Christmas recess. Here in Wisconsin the legislature generally adjourns each week from Friday until the following Tuesday, and occasionally recesses or temporarily adjourns for a week or two. We have but one biennial session. To construe sec. 10, art. V, as the similar section of the constitution of the United States was construed by the supreme court of the United States would result in confusion, and impose unnecessary hardships and burdens upon both the governor and the legislature.

It is our conclusion that Bill No. 56, S., Sess. 1933, became a law by virtue of the failure of the governor to return it with his objections to the house in which it originated, by delivering it to the clerk or some responsible officer thereof, within six days (Sundays excepted) from the time it was presented to him, and that the circuit court erred in granting the defendant's motion to quash the alternative writ of *mandamus* herein.

*By the Court.*—Order reversed, and cause remanded with directions to deny the defendant's motion to quash the alternative writ of *mandamus,* and for further proceedings in accordance with the opinion.

FRITZ, J., dissents.