REBECCA FRANK DALLET, J. (dissenting).
*224 ¶43 The Legislature unconstitutionally met in an "extraordinary session" in December 2018 and therefore 2017 Wisconsin Act 368, 2017 Wisconsin Act 369, and 2017 Wisconsin Act 370 are void ab initio and the Senate's confirmation of 82 gubernatorial appointments is invalid. In order to uphold the constitutionality of the December 2018 extraordinary session, the majority opinion subverts the plain text of Article IV, Section 11 of the Wisconsin Constitution. Therefore, I dissent.
¶44 Constitutional interpretation is a question of law that we review de novo. Appling v. Walker, 2014 WI 96, ¶17, 358 Wis. 2d 132, 853 N.W.2d 888. We look first to the words of the constitutional provision at issue to determine its meaning. See Coulee Catholic Schools v. LIRC, 2009 WI 88, ¶57, 320 Wis. 2d 275, 768 N.W.2d 868 (noting that the "authoritative, and usually final, indicator of the meaning of a provision is *542 the text-the actual words used.") Constitutional language is to be read, whenever possible, to give reasonable effect to every word, in order to avoid surplusage. See Appling, 358 Wis. 2d 132, ¶23, 853 N.W.2d 888.
¶45 Article IV, Section 11 of the Wisconsin Constitution constrains the Legislature from meeting except under two circumstances: (1) "at such time as shall be provided by law," and (2) "unless convened by the governor in special session." The majority agrees that "provided by law" means our statutes. Majority op., ¶16; see also State v. City of Oak Creek, 2000 WI 9, ¶27, 232 Wis. 2d 612, 605 N.W.2d 526 ("[T]he drafters meant statutory law when they used the phrase, 'provided by law.' "). The only "such time" that is "provided by law" for the Legislature to meet is set forth in Wis. Stat. § 13.02, entitled "Regular sessions." Subsection 1 of § 13.02 authorizes the Legislature to convene at the outset of the biennieum "to organize itself for the conduct of its business." Subsections 2 and 4, accordingly, describe when the regular session commences and the fate of measures that have not received final action by the adjournment of the regular session. Subsection 3 instructs the joint committee on legislative organization to meet early in each biennial session period to "develop a work schedule for the legislative session ... to be submitted to the legislature as a joint resolution." § 13.02(3). Senate Joint Resolution 1 ("JR1") outlined the work schedule for the 2017-2018 biennial session period with dates upon which the floorperiods began and ended.[1]
*543 ¶46 The December 2018 extraordinary session was not a date identified in JR1. March 22, 2018, was the final date the Legislature met pursuant to the work schedule[2] and, as was the practice at the end of each legislative session, bills that were not passed in identical fashion by both houses expired.[3] Although the Legislature *225 can, utilizing proper procedure, recess and reconvene on a future specified date, pursuant to Thompson and Dammann, the Legislature set no future meeting date upon its adjournment. See *544 State ex rel. Thompson v. Gibson, 22 Wis. 2d 275, 290, 125 N.W.2d 636 (1964) ; State ex rel. Sullivan v. Dammann, 221 Wis. 551, 267 N.W. 433 (1936).[4] As provided by law, the next regular session was set to commence on January 7, 2019, unless the Governor convened a special session. On March 22, 2018, the Legislature adjourned sine die, or ceased to exist, as there were no future scheduled meetings of the regular session laid out in JR1.[5] Therefore, there was no authority for the majority of members of two committees to convene a previously unscheduled meeting of the full Legislature in early December 2018.[6] *545 ¶47 The majority opinion subverts the constitutional text in two ways to legitimize the December 2018 extraordinary session. First, the majority opinion asserts that the extraordinary session was really part of a regular session because when the Legislature first met on January 3, 2017, to convene its regular session, it stayed in a continuous two-year "biennial session" until January 7, 2019.[7] It is elementary to *226 point out that an "extraordinary," or "special," session by its very name, is the opposite of a "regular," or "planned," session. Although the title of Wis. Stat. § 13.02, "Regular sessions," alone is not dispositive, it is "persuasive evidence of a statutory interpretation." Mireles v. LIRC, 2000 WI 96, ¶60 n.13, 237 Wis. 2d 69, 613 N.W.2d 875.
¶48 Under the majority opinion's reading of Article IV, Section 11, the words "at such time" and "unless" become superfluous because the Legislature could meet at any time. Yet, this court has recognized that "[t]o avoid surplusage, our analysis must also take into account and give meaning to the choice of the word[s]" in the constitutional provision. Appling, 358 Wis. 2d 132, ¶25, 853 N.W.2d 888. A continuous two-year session would also render meaningless several other laws which distinguish between days that the Legislature is in session and days when it is not.[8] The majority *546 opinion fails to logically explain how a continuous two-year session comports with the constitutional mandate to meet at "such time as shall be provided by law."[9]
¶49 Second, the majority opinion further subverts the constitutional text by redefining the clause "as shall be provided by law" to include a joint resolution passed by the Legislature.[10] The majority accepts the Legislature's assertion that the work schedule set forth in JR1 allowed the Legislature to reserve to itself every unscheduled day for the possible convening of an extraordinary session. I agree with the circuit court *547 that the Legislature's purported ability to meet any day, even if it is not scheduled, is the antithesis of a work schedule as set forth in Wis. Stat. § 13.02(3) "by both definition and force of logic." The distinction between a session "provided by law" as set forth in § 13.02 and the Legislature's attempt to reserve to itself through a joint resolution the unlimited power to schedule an extraordinary session is made even clearer by the existence of specific statutory provisions that do explicitly set forth extraordinary sessions.[11] See, e.g., *227 Wis. Stat. § 196.497(10)(c) ("[w]ithin 120 days after the bill is introduced the appropriate committees in each house of the legislature shall authorize an extraordinary session of the legislature to commence within the 120 days and to extend until the legislature passes the bill or passes a joint resolution which disapproves of the agreement or modification ...) (emphasis added); see also 1987 Wisconsin Act 4 (temporarily creating Wis. Stat. § 13.02(3m) to authorize an extraordinary session between the biennial session period's two regular annual sessions). Ultimately if the Legislature wanted to meet in December 2018 in accordance with the Constitution, it should have passed a bill to authorize extraordinary sessions, as it has done in the past.
¶50 In its analysis of the meaning of Article IV, Section 11, the majority opinion dismisses the importance of the intent of the drafters.[12] See majority op., *548 ¶18. However, this court "gives[s] effect to the apparent understanding of the drafters and the people who adopted the constitutional provision under consideration." State v. Williams, 2012 WI 59, ¶15, 341 Wis. 2d 191, 814 N.W.2d 460. It is undisputed that at the time of its passage, Article IV, Section 11 was understood to place limits on legislative power. In 1848, the drafters sought to avoid a continuation of colonial-era abuses involving irregular meetings of the Legislature. See Robert Luce, Legislative Assemblies, at 123 (1924) (describing "irregularity of sessions [ ]as a bitter grievance with the colonists"). The drafters accordingly constrained and limited the Legislature's power, including where, when, and how often it could meet. See G. Alan Tarr, Understanding State Constitutions, 65 Temple L. Rev, 1169, 1174 (1992) (noting that limitations on legislative power were "designed to ensure a more open and orderly deliberative process ... in response to widespread legislative abuses"). The Constitution therefore includes specific constraints on the Legislature in order to protect against "the tyranny of legislation." Views of "K"-No. 2, Madison Express (Mar. 26, 1846), reprinted in Milo M. Quaife, The Movement for Statehood 1845-1846, at 146 (State Historical Society of Wisconsin 1918). Despite this fear of legislative abuses and the drafters' goal to ensure transparency, the majority opinion now broadens the Legislature's powers.
¶51 The majority dedicates pages of its opinion to a discussion of separation of powers and "[t]he [l]egislative [p]ower." See majority op., ¶¶29-41. It fails to account for the fact that "[j]udicial respect for its co-equal branch, the legislature, cannot amount to *549 surrender of judicial power or abdication of judicial duty." Mayo v. Wisconsin Injured Patients and Families Comp. Fund, 2018 WI 78, ¶84, 383 Wis. 2d 1, 914 N.W.2d 678 (R.G. Bradley, J, concurring). As the majority opinion correctly notes, "[t]he judiciary serves as a check on the Legislature's actions only to the extent necessary to ensure the people's elected lawmakers comply with our constitution in every respect." Majority op., ¶41. That is exactly what happened here: the Legislature violated the plain constitutional text, and this court must act as a check.
¶52 Wisconsin Constitution Article IV, Section 8 also cannot justify judicial non-interference here, as the majority opinion suggests. Article IV, Section 8 simply states: "[e]ach house may determine the rules of its own proceedings." Section 8 should not swallow Section 11 whole, as the majority opinion seems to suggest. According to the Legislature, *228 Article IV, Section 8 gives it unlimited power to name and determine the procedures it follows, even if it acts in violation of Article IV, Section 11. The majority opinion claims that this court should not " 'intermeddle in purely internal legislative proceedings,' " citing to Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶18, 319 Wis. 2d 439, 768 N.W.2d 700. Majority op., ¶37. However, in Milwaukee Journal Sentinel, this court acknowledged that while the Legislature has discretion in "choosing how to comply with the publication requirement" in Article IV, Section 17(2), it may not "ignore the constitutional publication requirement altogether."[13] Id., ¶33. Instead, *550 this court defined its role as follows: "[w]hile we are conscious of the substantial deference we owe to the other independent branches of government in the exercise of their constitutional responsibilities, we are also conscious of our own responsibility to determine whether the provisions of the Wisconsin Constitution have been followed." Id. The Legislature's ability to determine the rules of its proceedings pursuant to Article IV, Section 8 does not swallow up the meeting requirements of Article IV, Section 11 or allow it to wield unbridled power.
¶53 The plain constitutional text of Article IV, Section 11 makes clear that with the exception of the Governor's ability to call special sessions, the Legislature has authority to "meet" only at "such time as shall be provided by law." Yet, the majority opinion ignores this clear language and instead concludes that a joint resolution work schedule is "law" that allows for a continuous, perpetual legislative session and the ability to convene at any time without notice. Because the Legislature unconstitutionally met in an "extraordinary session" in December 2018, the passage of 2017 Wisconsin Act 368, 2017 Wisconsin Act 369, and 2017 Wisconsin Act 370 is void ab initio and the Senate's confirmation of 82 gubernatorial appointments is invalid.
¶54 I respectfully dissent. I would vacate the court of appeals' stay and affirm the circuit court.
*551 ¶55 I am authorized to state that Justices SHIRLEY S. ABRAHAMSON and ANN WALSH BRADLEY join this dissent.

For example, JR1 provides that "[a] floorperiod commences on Tuesday, January 16, 2018, at 10 a.m., and, unless adjourned earlier, ends on Thursday, January 25, 2018." JR1 prescribes times and dates for each event on the schedule. JR1 is also broken up into different sections, including "Floorperiod[s]," "last general-business floorperiod," "limited-business floor period," etc.

JR1 states that "[t]he last general-business floorperiod commences on Tuesday, March 13, 2018, at 10 a.m., and, unless adjourned earlier, ends on Thursday, March 22, 2018."

To disprove the fact that the Legislature adjourned sine die on March 22, 2018, the majority opinion points to JR1's identification of a "limited-business floorperiod" to commence on April 17, 2018 and end no later than April 19, 2018 and a "veto review floorperiod" to commence on May 8, 2018 and end no later than May 9, 2018. Majority op., ¶27. The Legislature did not make this argument on appeal, probably because it never actually met on those dates. As counsel for Governor Evers noted to the circuit court at oral argument: "[t]here were some sort of contingent dates [in April and May 2018], but they never actually came back for those dates." Senate and Assembly calendars and journals affirm the fact that the last date that the Legislature met in regular session was March 22, 2018.
Further, while the majority opinion asserts that the Legislature adjourned sine die on January 7, 2019, there is no proof presented or journal entries that document that date as the date of adjournment. The "Session Calendar" available on the Legislature's website says that "March 23, 2018 to January 7, 2019" is designated "Interim, committee work." See https://docs.legis.wisconsin.gov/2017/related/session_calendar/calendar; see also https://docs.legis.wisconsin.gov/2017/related/session_calendar/floor_period_calendar.pdf.

Thompson and Dammann also clarify that it is the Legislature's lawmaking authority in session that terminates upon its sine die adjournment, not its other work functions, including committee meetings. See State ex rel. Thompson v. Gibson, 22 Wis. 2d 275, 290, 125 N.W.2d 636 (1964) ; State ex rel. Sullivan v. Dammann, 221 Wis. 551, 267 N.W. 433, 437 (1936). It is of no import to this case that committee work continued after March 22, 2018, because this work is not part of the Legislature's lawmaking authority and such committee meetings are not the type of meetings defined by Article IV, Section 11.

As support for its assertion that the Legislature adjourned sine die on March 22, 2018, the League underscores how legislators and observers alike understood that the regular session ended on that date. See, e.g., Rep. Hesselbein, Capitol Update (Apr. 13, 2018) ("The Wisconsin State Assembly wrapped up its floor period for the 2017-18 session on March 22."); Hamilton Consulting Group, LLC, Hamilton Political Tidbits-2018 Session Wrap Up (Mar. 23, 2018) ("[T]he legislature will not reconvene until January 2019."); Joe Forward, Legislative Wrap-Up, 10 Inside Track No. 6 (State Bar of Wisconsin), Apr. 4, 2018 ("The Wisconsin Legislature passed a barrage of bills [in March 2018] to close the 2017-18 session.").

The December 2018 meeting of the Legislature was convened upon the votes of five members of the Assembly, out of 99 members, and three members of the Senate, out of 33 members.

The majority opinion continuously references the term "biennial session"; however, Wisconsin has not had a biennial legislative session for nearly 50 years. Since 1971, the law has mandated that the Legislature "shall meet annually." Wis. Stat. § 13.02. Section 13.02(3) says that the Legislature "shall" hold "at least one meeting in January of each year." If there is a singular meeting coextensive with the entire biennial session period, this phrase is meaningless.

For example, Wis. Stat. § 13.625(1m)(b) 1 prohibits lobbyists from making financial contributions to legislators until "the legislature has concluded its final floorperiod." Under this statutory section, no lobbyist could ever be certain that the Legislature "has concluded its final floorperiod." Further, Wis. Stat. § 757.13, which limits the courts' jurisdiction over members of the Legislature while they are "in session," would be rendered virtually meaningless if the Legislature was in one perpetual session. Finally, Wis. Stat. § 13.123, which sets forth the extent to which legislators are entitled to a per diem allowance for food and lodging, would be meaningless if the Legislature met perpetually. Under the majority's reasoning, legislators would be entitled to per diem reimbursement every day of every year, which undermines the entire purpose of a per diem reimbursement.

Since 1848, Article IV, Section 11 has been amended twice, but it is noteworthy that neither revision has transferred extraordinary convening authority to the Legislature.

In a novel argument that the majority raises on behalf of the Legislature, it asserts that like extraordinary sessions, floorperiods are not mentioned in the statutory text. Majority op., ¶22. However, as counsel for the League properly pointed out at oral argument, the work schedule, which governs the regular session, references floorperiods and the legislative journals inform us that floorperiods have long been considered part of the regular session. On the other hand, non-prescheduled floor sessions, like the extraordinary session here, were not part of the regular session.

The explicit reference to an extraordinary session in our statutes also shows that regular and extraordinary sessions are treated distinctly and are different in kind. This is more than just a dispute over taxonomy and the proper naming of sessions.

Although the majority opinion labels proof of the drafter's intent an unnecessary "historical review," majority op., ¶18, it relies upon the drafter's intent in another section of its opinion where it bolsters its argument. See majority op., ¶31.

The Milwaukee Journal Sentinel court cited to La Follette in favor of that proposition. Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶18, 319 Wis. 2d 439, 768 N.W.2d 700 (citing La Follette v. Stitt, 114 Wis. 2d 358, 364, 338 N.W.2d 684 (1983) ). In La Follette, this court held that it would not "review legislative conduct to ensure the legislature complied with its own procedural rules or statutes in enacting the legislation." La Follette, 114 Wis. 2d at 364, 338 N.W.2d 684. However, the court noted that this was because these were "purely legislative concerns" in the "absence of constitutional directives to the contrary." Id. In contrast, this case deals with constitutional requirements that the Legislature turned a blind eye to in December 2018.